[No. 1,070.]

THE STATE OF NEVADA, ex rel. M. A. MURPHY, Attorney General, *v.* J. B. OVERTON et al., Trustees of the Nevada Benevolent Association, Respondents.

Lottery — Act to Aid Nevada Benevolent Association Unconstitutional.—The act to aid the Nevada Benevolent Association in providing means for the care and maintenance of the insane of Nevada (stat. 1881, 166) provides, that it shall be lawful for the association to give public entertainments, to sell tickets of admission, to distribute among the ticket-holders personal property, etc., and to regulate the distribution by raffle or other schemes of like character: *Held*, that the scheme or enterprise in which the association is engaged is a lottery, and that the act is unconstitutional.

Quo warranto, before the Supreme Court.

The facts appear in the opinion.

*M. A. Murphy*, Attorney General, for Relator:

I. The Nevada Benevolent Association never has been a corporation under the laws of this state; because section 3389 of the compiled laws does not authorize the formation of corporations for the purpose of holding or conducting public entertainments or gift enterprises.

II. The privileges and franchises usurped by the said board of trustees are not legitimate or legal, because they have attempted to usurp a franchise without authority of

law, and to do those things which by law they were and are prohibited from doing. (Sec. 2494, Comp. L.) The articles of incorporation upon their face show that the company has been formed for an illegal purpose, that of giving concerts or gift enterprises where property is to be distributed by a game of chance.

III. The act of the legislature of March 9, 1881, is unconstitutional, because it is in conflict with section 24, article IV., of the constitution. (The authorities cited by counsel are referred to in the opinion.)

IV. The constitution of a state is higher in authority than any law made by any body or any set of officers assuming to act under it, since such body or officer must exercise a delegated authority, and one that must necessarily be subservient to the instrument by which the delegation was made. In such case of conflict the fundamental law must govern, and the act in conflict with it must be treated as of no legal validity. (Cooley on Const. Lim. 43, 44; Potter's Dwarris on Stat. and Const. 44.) By the constitution which the people establish, they not only tie up the hands of their official agencies, but their own hands as well, and neither the officers of the state nor the whole people, as an aggregate body, are at liberty to take action in opposition to this fundamental law. (Cooley's Const. Lim. 28; Potter's Dwarris on Stat. c. 1.)

V. The Nevada Benevolent Association scheme is a lottery, within the ordinary meaning of the word as defined in the English dictionaries. "It is a distribution of prizes by chance," which is one of the definitions of a lottery by Johnson and Webster. It is a kind of a game of hazard, wherein several lots of merchandise, property, or money are deposited in prizes for the benefit of ticket-holders. (Brand's Encyclopedia, American Cyclopedia, Encyclopedia Britannica, title Lotteries; Bouv. L. Dic., title Lottery. Other authorities cited are referred to in the opinion.)

VI. A repealing clause in an unconstitutional act does not repeal the former law. (*State* v. *McClear*, 11 Nev. 39; *Tims* v. *State*, 26 Ala. 165; *People* v. *Tephaine*, 3 Park. Crim. L. 241; *Shepardson* v. *M. B. R. R. Co.*, 6 Wisc. 614; *State* v.

*Judge of County Court*, 11 Id. 50; *Sullivan* v. *Adams*, 3 Gray, 476; *Devoy* v. *Mayor et al. of N. Y.*, 35 Barb. 270; *Campau* v. *Detroit*, 14 Mich. 276; *Childs* v. *Shower*, 18 Iowa, 261; *Harbeck* v. *Mayor of New York*, 10 Bosw. 366.)

*A. C. Ellis, B. C. Whitman*, and *W. H. L. Barnes*, for the Respondents:

I. No facts are stated in the complaint to warrant a forfeiture under any law of this state. Sections 389 and 400 of the compiled laws govern the case stated, if any, which we deny, but the proceeding here referred to, must be brought by the district attorney. And besides, no facts are stated, which under any of these sections, would either work a forfeiture, or upon which a judgment can be based, declaring that this "Nevada Benevolent Association" never had a legal existence.

II. The allegation that these trustees base their right to do the things alleged upon an act of the legislature subsequently passed, is not an allegation of fact, it is ideal, it is speculative, it is abstract; nor is it a threat of future action, it is a statement of a present belief and opinion of the trustees, which may to-morrow be modified or changed. And we maintain that the validity of this act can not be called in question in this manner. (*Burling* v. *Goodman*, 1 Nev. 314; *Hess* v. *Pegg*, 7 Id. 23; *Overman S. M. Co.* v. *Amer. M. Co.*, Id. 322; *Phillips* v. *Welch*, 11 Id. 187; S. C., 12 Id. 159.)

III. The law in question is constitutional. It is presumed to be so unless it can be clearly made to appear to the contrary. Every intent is in favor of the constitutionality of the law. (*Ash* v. *Parkinson*, 5 Nev. 15; *Clarke* v. *Irwin*, Id. 111; *Evans* v. *Job*, 8 Id. 132.) It was the intention of the framers of the constitution to prevent the state as such from engaging in lotteries to raise revenue. (Const., art. 4, sec. 24.) This section was taken *verbatim* from the constitution of California, adopted in 1849 in convention, and was adopted by the convention of Nevada without debate. An examination of the debates of the California convention will show that this idea prevailed.

Those who opposed the section, did so upon the ground that the lottery was a desirable and convenient mode of raising revenue, and those who favored the section did so upon the ground that it was desirable that the state should raise its revenue otherwise, and by a different mode of taxation. (Debates in the Convention of Cal., 90, by J. Ross Browne.) Such was the original idea of lotteries. A historical review of this subject may be found in the Encyclopedia Brit., tit. Lottery; New American, tit. Lottery; Chambers, tit. Lottery.

IV. The language of our constitution, considered by itself, imports the same idea, and is exceedingly inapt to express the ideas claimed for it by the attorney general. "No lottery shall be authorized by this state." This is not a state lottery, if it is a lottery (which under the allegations of this complaint we deny); the state exercises no control. It is not said that it will be drawn under the auspices of the state, nor managed or controlled by officers or appointees of the state, nor at any place designated by the state, nor upon any terms or conditions named by the state.

V. No penalty is denounced in the constitution. If it be a crime or misdemeanor to carry on a lottery, it must be so defined by the legislature or the common law, and punished accordingly, but there is no statute of Nevada defining or punishing a lottery. But it is said the statute of 10 and 11 William III. is in force in this state, which statute defined and declared a lottery to be a public nuisance, and that it was so held in *Ex parte Blanchard,* 9 Nev. 101; 4 Bl. 168; but this will not aid the relator. If it is a public or common nuisance, it was either a crime or a misdemeanor, and as such can only be punished by indictmment. (3 Bl. 220.) But which was it, a crime or a misdemeanor? This must be determined in order that it can be punished at all under our statute.

VI. The statute of William declaring a lottery a public nuisance is not in force in this state; because our legislature has undertaken to declare what shall constitute public or common nuisances and to prescribe punishments therefor, and has omitted any reference to lotteries; and second,

the law in question repeals not only the lottery act of 1873 in terms, but also "all other acts (laws) or parts of acts in conflict with this act." It can not be argued that the repeal of this law is unconstitutional. The constitution did not forever fasten the statute of William III. upon us. The legislature surely has the power to repeal any law concerning lotteries.

VII. The act of 1873 to prohibit lotteries is repealed. (*Meshmeier* v. *State*, 11 Ind. 489; *Rhody Ely* v. *Thompson*, 3 A. K. Marsh. 70; *Tims* v. *State*, 26 Ala. 165; *McCarthy* v. *Judge Monroe Circuit*, 36 Mich. 275; *Yellow R. Imp. Co.* v. *Arnold*, 46 Wisc. 227.)

*R. M. Clarke*, also for Respondents:

I. Lotteries are (1) public or (2) private: public when organized and managed by the government for the benefit of the public and as a means of obtaining revenue; private when organized and managed by private individuals for private gain. It is matter of common knowledge that many governments, among them Austria, France, Great Britian, and many of the states of the American Union, have resorted to lotteries in order to raise money for the public service, and that until recent years, public lotteries have almost universally prevailed. (See New Am. Cyclopedia, vol. 10, 663, 664, 665; Whart. L. Dic. 467.)

II. The constitution is not couched in apt or proper words which express the intention to prohibit private lotteries or any lotteries except public. If it had been intended to prohibit all lotteries or private lotteries, the words "by this state," should have been omitted; but the addition of these words, otherwise unnecessary, can only be accounted for upon the theory that their use was intended to qualify, limit, and restrict the sense and application of the section to lotteries "by this state," that is to say, state lotteries, or lotteries carried on by the state for the purpose of raising revenue.

By the Court, Hawley, J.:

On the nineteenth day of February, A. D. 1881, articles

of incorporation of the "Nevada Benevolent Association"
were filed in the office of the county clerk of Storey county.
The object of the corporation being "to establish and carry
on the business of providing for and giving public enter-
tainments, in the state of Nevada, of a musical and scien-
tific character, to sell tickets of admission to such entertain-
ments, and to purchase, hold, and distribute among the
holders of such tickets personal property, real estate,
choses in action, and other valuable things, upon such terms
and conditions and in such manner and at such times as may
be determined by a board of managers to be selected for
that purpose by the board of trustees of this company." It
is provided that so much of the proceeds of said entertain-
ments "as may be deemed proper by the board of trustees,
but not less than fifty thousand dollars, from each enter-
tainment, are to be placed in the state treasury of the state
of Nevada to be used only for such charitable and benevo-
lent purposes as may be determined by the legislature of
the state of Nevada."

The "Act to aid the Nevada Benevolent Association in
aiding in providing means for the care and maintenance of
the insane of Nevada, and for other charitable purposes"
(approved March 9, 1881), declared that "it shall be lawful
for the Nevada Benevolent Association of the state of
Nevada to give not exceeding five public entertainments or
concerts, to sell tickets of admission to the same; to dis-
tribute among the holders of such tickets personal prop-
erty, real estate, things in action, demands or other
valuables, and to regulate the distribution of all such prop-
erty or gifts by raffle or other schemes of like character."
(Stat. 1881, 166, sec. 1.)

The information filed by the attorney general alleges that
respondents, as trustees of said association, are, without
warrant of law, "advertising, printing, circulating, and sell-
ing tickets for public entertainments  *.  *  *," and that
they "base their right to advertise, print, circulate, and sell
tickets for the said public exhibitions or entertainments,
and to purchase, use, hold, and distribute amongst the
holders of such tickets personal property, real estate,

choses in action, and other valuable things," upon the act of the legislature above referred to.

The facts set forth in the information are admitted by respondents to be true. Are the acts of respondents with-out warrant of law? Is the act of the legislature, approved March 9, 1881, constitutional?

1. Is the scheme or enterprise in which the "Nevada Benevolent Association" is engaged a lottery? This ques-tion is answered in the affirmative by the decision of this court in *Ex parte Blanchard,* 9 Nev. 104. Is that decision correct? It certainly is. It is sustained by every decision that has been rendered by the various courts in the United States upon this question.

Notwithstanding this fact, we are now earnestly asked to declare that the musical entertainment which the "Nevada Benevolent Association" proposes to give is not a lottery. Why not? What is a lottery? Every scheme for the dis-tribution of prizes by chance is a lottery. (*Governors of the Almshouse of New York* v. *American Art Union,* 7 N. Y. 239; *Dunn* v. *The People,* 40 Ill. 467; *State* v. *Shorts,* 32 N. J. L. 401; *Randle* v. *State,* 42 Tex. 585; *Chavannah* v. *State,* 49 Ala. 396; *Commonwealth* v. *Manderfield,* 8 Phil. 459; *United States* v. *Olney,* 1 Abb. U. S. C. C. 279.)

A lottery is a game of hazard in which small sums are ventured for the chance of obtaining greater. (*Bell* v. *State,* 5 Sneed, 509.) "A contrivance for the distribution of prizes by chance; a reliance upon the result of hazard; a decision of the values of the adventurer's investment of the favors of fortune" is a lottery. (*Wooden* v. *Shotwell,* 4 Zab. 795.) "Where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out to the public what the party who pays the money is to have for it, or whether he is to have anything, it is a lottery." (*State* v. *Clarke,* 33 N. H. 335; *Hull* v. *Ruggles,* 56 N. Y. 427.)

If a tract of land is divided into lots of unequal value, and the lots sold to different purchasers at a.uniform price, and are distributed amongst those purchasers by drawing or lot, this transaction is a lottery. (*Seidenbender* v. *Charles,*

4 Serg. & R. 160; *Ridgeway* v. *Underwood*, 4 Wash. C. C. 133; *Wooden* v. *Shotwell*, 3 Zab. 466; *United States* v. *Olney*, 1 Abb. U. S. C. C. 278.) Where the payment of five dollars by a member of the "American Art Union" entitled him to a chance of drawing a painting by means of names and numbers drawn from a box—this was held to be a lottery. (*Governors of Almshouse* v. *American Art Union, supra*.) A "gift sale" of books, according to a scheme by which the books are offered for sale at prices above their real value, and by which each purchaser of a book is entitled, in addition, to a gift or prize, is a lottery. (*State* v. *Clarke, supra*.)

In *Dunn* v. *People, supra*, the defendant was conducting a "gift sale" establishment. He kept upon his desk, at his place of business, a box filled with envelopes. Each of the envelopes had printed upon its back an advertisement, purporting that the envelope contained some valuable recipes and popular songs, and also a card descriptive of some article in an "immense stock of over two hundred and fifty thousand pianos, watches, sewing-machines, engravings, sets of jewelry, books, etc., worth one million five hundred thousand dollars, all to be sold for one dollar each, without regard to value, and not to be paid for until you know what you are to receive." The sale of one of these envelopes was held to be a sale of a lottery ticket.

A ticket which purports to entitle the holder to whatever prize may be drawn by its corresponding number in a scheme called a "prize concert," is a lottery ticket. (*Commonwealth* v. *Thacher*, 97 Mass. 583 ) A ticket in a "grand gift concert," for the benefit of the "Foundling Asylum of the Sisters of Charity, in the city of New York, and the Soldiers' and Sailors' Orphans' Home, of Washington, D. C.," stating that the bearer was "entitled to admission to a grand concert, * * * and to whatever gift may be awarded to its number," is a lottery ticket. (*Negley* v. *Devlin*, 12 Abb. Pr., N. S., 210.)

It makes no difference what name is given to the scheme.

> "A rose by any other name would smell as sweet;
> A thorn by any other name would prick as deep."

When the element of chance enters into the distribu-

tion of prizes it is a lottery, without reference to the name by which it is called. "He may choose to call his business a gift sale," said the court in *Dunn* v. *People, supra,* "but it is none the less a lottery, and we can not permit him to evade the penalties of the law by so transparent a device as a mere change of name. If it differs from ordinary lotteries, the difference lies chiefly in the fact that it is more artfully contrived to impose upon the ignorant and credulous, and is, therefore, more thoroughly dishonest and injurious to society."

"The name given to the process and the form of the machinery used to accomplish the object are not material, provided the substance of the transaction is a distribution or disposition of property by lot." (*State* v. *Clarke, supra.*) Courts will not inquire into the name, but will determine the character of the scheme by the nature of the transaction or business in which the parties are engaged. (*Randle* v. *State, supra.*) "The character of the scheme is in no wise changed by the charitable purposes expressed in its title, nor by calling the drawings 'entertainments or gift concerts.'" (*Ex parte Blanchard, supra.*)

The fact that no plan of distribution has been determined upon does not relieve the scheme of its character as a lottery. (*Thomas* v. *People,* 59 Ill. 163.) "Nor is it material," said the court of appeals in *The American Art Union case,* "to the question in hand that the prizes were not known and designated when the tickets or chances were subscribed and paid for. The scheme in this respect is more objectionable than a scheme in which the prizes are previously fixed, because it affords less security to the subscribers that the chance purchased is worth the money paid for it."

We are of opinion that the facts stated in the articles of incorporation, in the statute, and in the information, show that the scheme is one whereby the legislature of this state, in consideration of the sum of $250,000, to be placed in the state treasury, to the credit of the "insane and charitable fund," attempted to authorize the managers of the "Nevada Benevolent Association" to enrich their own

pockets, at the expense of the people of this and other states, by holding out promises of the great and sudden gains that might be acquired by the ticket-holders; that golden prizes would be " the lure to incite the credulous and unsuspecting into this scheme."

In the light of all the facts that have been presented, it would be absurd to say that the managers of this scheme are simply prompted by deeds of charity and pure benevolence. We think it is fair to presume that some of the purchasers of tickets to the entertainments, to be given by the association, would receive blanks; but even if every ticket-holder drew a prize, the scheme would still be a lottery.

In *Wooden* v. *Shotwell, supra,* the court said: " The prizes were distributed by lot. The fact that the scheme contained no blanks, but that every adventurer was to receive something for his money, only rendered the device the more successful, and its results consequently the more injurious, without altering its essential character." In *Dunn* v. *The People, supra,* the court said: " Neither would the character of the transaction be changed by assuming that the ticket in every envelope really represents some article of merchandise intrinsically worth the dollar which the holder will be obliged to pay. If every ticket in an ordinary lottery represented a prize of some value, yet, if these prizes were of unequal values, the scheme of distribution would still remain a lottery."

In the face and teeth of the decisions which we have referred to, we can not say that the scheme proposed by the "Nevada Benevolent Association" is not a lottery. It has the essential elements and attributes of a lottery; the distribution of prizes by chance. It is a lottery within the definition given in the dictionaries; it is a lottery according to the ordinary acceptation of that word; it is a lottery within the terms specified by the legislature of this state in the "act to prohibit lotteries" (Stat. 1873, 186); it is a lottery within the meaning of that word as used in the constitution.

2. Is the act approved March 9, 1881, constitutional? This question is as clear and plain to our minds as the one already decided. It will not admit of any reasonable doubt.

The language of the constitution is susceptible of but one meaning. There is no room for construction. Nothing upon which any real or substantial argument can be based.

"No lottery shall be authorized by this state, nor shall the sale of lottery tickets be allowed." (Const. art. 4, sec. 24.) The act in question attempts to authorize a lottery, and to allow the sale of lottery tickets in this state in direct violation of the plain letter and spirit of this provision of the constitution. It would be a perversion of the language of the constitution to say that the act is valid.

Respondents, however, contend that the constitution "does not prohibit private lotteries, and was by its framers intended only to prevent the legislature from involving the state in a system of public lotteries as a means of raising money for the service of the state," or, in other words, that this constitutional provision was only intended as a limitation of power to prevent the state, as a state, from engaging in public lotteries for the purpose of raising means for the general revenue of the state. Hence they claim that the state has the right to authorize private parties to conduct and carry on a lottery of the character specified in the information.

In support of this position they refer to the debates of the constitutional convention in California upon the adoption of a provision in the constitution of that state identical with ours. It is not claimed that these debates have the weight of a judicial decision, but that it is proper to examine them in case of doubt as to the intention of the framers of the constitution. The remarks of the different members shed but little light upon the real question at issue. They are as much in favor of the position taken by the attorney general as they are in favor of the respondents. The debates show that the constitution of New York was referred to in discussing the provision that was adopted in California. Mr. Halleck, who was in favor of the adoption of the lottery provision, in the course of his argument, said: "In nearly all the new constitutions you will find this clause. It was not contained in the old constitutions, but in most cases, where they have been amended, it has been introduced. In the old consti-

tution of New York, to which reference has been made in the course of debate, no prohibition was inserted. Many gentlemen present would remember the famous *case of Yates and McIntyre*, which involved not only individuals of the state in ruin, but was the occasion of serious embarrassment to the state government itself. The result so clearly established the evils of the lottery system that the convention of New York, in 1846, inserted a clause in the very first article of the new constitution (see sec. 10) prohibiting lotteries and sale of lottery tickets. It appeared to him * * * that this prohibition was one of the best that could be inserted in the article limiting the powers of the legislature."

The language of the tenth section of article 1 of the constitution of 1846, referred to by Mr. Halleck, is as follows: "Nor shall any lottery hereafter be authorized, or any sale of lottery tickets allowed within this state."

In *The Governors of the Almshouse* v. *American Art Union*, *supra*, it was contended by Charles O'Conor, counsel for the Art Union, as it is here, that the constitution was only intended to prevent the mischievous practice of raising a revenue by public lotteries, which had been for many years in full vigor both in England and in this country, and that the prohibitions of the constitution were only directed against this particular evil. He referred to the fact, as do counsel here, that "from 1709 to 1824 public lotteries were authorized at every session of parliament." He also referred to the debates of the constitutional convention of 1821, for the purpose of showing that "public lotteries for pecuniary prizes as a means of raising revenue were alone within the contemplation of that body."

The constitution of 1821 is in these words: "No lottery shall hereafter be authorized in this state, and the legislature shall pass laws to prevent the sale of all lottery tickets within this state, except in lotteries already provided for by law." The court of appeals, in referring to this constitution, which it declared to be substantially the same as the constitution of 1846, said: "This prohibition is general. It must be held to embrace all lotteries, unless there be some very clear and satisfactory reason for understanding it

in a more limited sense. It was urged upon the argument, that public lotteries for pecuniary prizes as a means of raising revenue were alone within the contemplation of the framers of the constitution. But lotteries have never been created within this state for the purposes of general revenue, and there is therefore no ground for believing that the prohibition was intended to be limited to lotteries for that object. This would have been restraining a mischief which did not exist, and tolerating that which did. Lotteries had been authorized by the legislature for the benefit of colleges, for the making of roads, for the building of bridges, for the improvement of ferries, for the erection of hospitals, and for various other purposes equally commendable and beneficial. All these were clearly within the prohibition. The prohibition was not aimed at the objects for which lotteries had been authorized, but at that particular mode of accomplishing such objects. It was founded on the moral principle, that evil should not be done that good might follow, and upon the more cogent practical reason, that the evil consequent on this pernicious kind of gambling greatly overbalanced, in the aggregate, any good likely to result from it. The promotion of the fine arts is undoubtedly a commendable object, but the prohibition contains no exception in its favor on that ground. * * * The intention of the framers of the constitution undoubtedly was to forbid the future granting of any such lotteries as had at any time previously been authorized by law, and by requiring the legislature to pass laws to prevent the sale of *all lottery tickets*, to put an end to all such distributions of money or goods by lot or chance as had theretofore been forbidden by statute under the name of private lotteries."

The argument that the words " by this state" were inserted for the purpose of preventing the legislature from authorizing public lotteries as a means of raising revenue, and that the provision was not intended to prevent the legislature from authorizing private lotteries, is wholly untenable. No authority has been produced in its support, and we are satisfied that none can be found.

In construing this provision of the constitution the last

sentence is as important as the first. If the framers of the constitution had intended by the use of the words, "No lottery shall be authorized by this state," to only limit the legislative power to public lotteries, conducted and managed solely by the state for the purpose of raising revenue, they would not have used the language they did in the concluding sentence: "Nor shall the sale of lottery tickets be allowed." These words clearly show that it was not intended that any lottery should be authorized by this state for any purpose.

The words "by this state," as used in our constitution, and the words "in this state," "or within this state," as used in the constitutions of New York, have virtually the same meaning. "No lottery shall be authorized by this state, nor shall the sale of lottery tickets be allowed." This language applies to all lotteries, whether public or private. To lotteries conducted by the state; by the church; by private individuals; by benevolent and charitable associations, and by corporations. No lottery of any kind can be authorized by the legislature under the present constitution.

The constitution of Texas is as follows: "No lottery shall be authorized by this state, and the buying and selling of lottery tickets within this state is prohibited." Here the words "no lottery shall be authorized by this state," upon which respondents rely for their construction, are identical with the words in our state constitution. The balance of the provision is substantially the same.

The supreme court of Texas, in construing the constitution of that state, said: "The constitutional provision needs no aid to show what is meant, so far *as the granting authority by any power in the state to establish a lottery is concerned,*" and declared that "the operation of the 'Galveston Gift Enterprise Association' shows clearly that it is, in its operation and essence, a scheme for the distribution of prizes by chance, or, in other words, is a lottery, within the very letter and spirit of the law, and is a *plain infringement on the constitutional inhibition of lotteries.* That the act to regulate taxation, June 3, 1873, 'which levies an occupation tax upon gift enterprises,' has no force

or power to legalize this or any of its kindred offenses."
(*Randle* v. *State*, 42 Tex. 589.) This decision is approved
by the court of appeals, in *Holoman* v. *State*, 2 Tex. (Ct. of
Ap. 612).

The constitution of Indiana reads as follows: "No
lottery shall be authorized, nor shall the sale of lottery
tickets be allowed." (Art. 4, sec. 8, Const. 1851.) Under
this provision the supreme court declared that no lotteries
could be authorized by the legislature. (*Whitney* v. *State*,
10 Ind. 405; *Swain* v. *Bussell*, 10 Ind. 438.) The constitu-
tion of Missouri reads as follows: "The general assembly
shall never authorize any lottery, nor shall the sale of lottery
tickets be allowed." It was held that this provision pro-
hibits the legislature from authorizing any lottery, and for-
bids the allowance of the sale of lottery tickets. (*Kitchen*
v. *Greenabaum*, 61 Mo. 114.)

We again repeat what, it seems to us, must be evident to
every unbiased and impartial mind, that the language of the
constitutional provision is too plain for argument. That
under it the legislature can not authorize any lottery in this
state, and that the act approved March 9, 1881, is null and
void. We are conscious of the fact that it was unnecessary
to add anything to the reasoning of this court, in *Ex parte
Blanchard*, which is, of itself, absolutely conclusive upon
both of the points we have discussed. But it has been at-
tempted, by a desire upon our part, to show that no
authority could be found in any of the adjudicated cases in
the United States to sustain the position contended for
by respondents; and that no argument has been advanced
by respondents, upon either of these points, that has not
heretofore been decided adversely to them by the courts of
other states, where the constitutional provisions are sub-
stantially the same as our own.

It is proper to add that we have arrived at the conclusion
stated without considering the question of the morality, or
immorality of this particular scheme. It makes no differ-
ence whether it was set on foot purely for the purpose of
raising revenue for the benefit of the "insane and charita-
ble fund" of this state, or whether it belongs to that class

of lotteries that are made up of pecuniary prizes and minister to the love of gain; whose schemes address themselves in the grossest and most revolting form directly to that sordid passion, and to no other sentiment; where the managers receive a pecuniary profit and enlist "a corps of active seducers to draw the weak and unwary into the purchase of tickets" by extensive advertisements containing brilliant pictures of the favorable chance to acquire sudden wealth.

It may be admitted for the purposes of this decision, as was argued by respondents' counsel, that the people of this state are essentially a gambling people, ready at all times to take the desperate chances which lotteries afford, and that no injurious effects upon the morals of the people would result if this game of chance was allowed to proceed. This question is one that must be considered as settled by the adoption of the constitutional provision. (*Ex parte Darling*, recently decided.)

In the *Art Union case*, to which we have frequently referred, it was claimed that the enterprise was really of a meritorious character, and that it differed, in this respect, from the lotteries where the managers were to receive the lion's share of the profits. The court, in answer to this argument, said: "If no lotteries had existed, excepting such as is contained in the Art Union scheme, it is not probable that they would have been forbidden by the constitution or by law. Its mischiefs are certainly not so apparent as if its prizes were to be paid in money, or as it would be if framed for the purpose of enticing the necessitous and improvident into its hazards. But this case can not be decided according to the views we may entertain of the probable good or evil consequent upon the execution of the scheme. *The constitution took away the power of determining whether this or any other lottery was of good or evil tendency*, and certainly did not intend to confer that power on the judicial tribunals. If it were to be admitted that the scheme is entirely harmless in its consequences, it would form no ground for making it by judicial construction an exception to the general and absolute constitutional prohibition."

Courts can not make any distinction in this respect, as to the nature of the transaction or the character of persons engaged in it. It is their bounden duty to declare the law. "The law knows no person; it is not made for the individual man, but for men. As the dew of heaven falls, so it bears alike upon the just and unjust." (*State* v. *Pierce*, 8 Nev. 304.) It smiles and frowns upon all alike. It makes no distinctions. Submission to its authority is incumbent upon all.

3. It is unnecessary to discuss any of the other points suggested by respondents' counsel. We will not presume, in advance, that respondents intend to violate the law. From the views already expressed it is apparent that it would make no difference whether respondents base their right to act in the premises under the articles of incorporation or under the provisions of the act of the legislature. In either event their acts would be without warrant of law.

The judgment of this court is that the respondents have no right, liberty, or franchise by virtue of any law, to advertise, print, circulate, or sell any tickets in the scheme or enterprise of the "Nevada Benevolent Association," within this state, or to do any of the acts specified in the statute, "to aid the Nevada Benevolent Association," approved March 9, 1881 (Stat. 1881, 166); and that the costs of this proceeding be taxed against them.