J. M. LEE, as Comptroller, *et al.,* v. THE CITY OF MIAMI, *et al.*

163 S. 486.
Opinion Filed September 27, 1935.
Rehearing Denied October 5, 1935.

*Cary D. Landis,* Attorney General, *G. A. Worley,* State Attorney, *J. V. Keen,* Assistant, Attorney General, *Philip D. Beall,* and *John R. Beacham,* for Appellants;

*J. W. Watson, Jr.,* and *Abe Aronovitz,* for Appellees.

TERRELL, J.—This appeal is from a decree of the Circuit Court of Dade County restraining J. M. Lee, as Comp-

troller of the State of Florida, Leonard Thompson, as Tax Collector of Dade County, and W. F. Blanton, as County Judge of Dade County, from enforcing, administering, or attempting to enforce any of the powers or duties vested in them under House Bill 1131, now Chapter 17257, Acts of 1935, Laws of Florida.

The purpose of Chapter 17257 is briefly stated in the title which is as follows:

"AN ACT to License Certain Types of Coin-Operated Devices; to Regulate the Operation Thereof; to Designate the Penalties for the Violation of the Provisions of This Act; to Define Certain Types of Coin-Operated Devices; Providing for the Division and Distribution of the Revenue Derived Therefrom and Other Matters Properly Relating Thereto; and to Provide for Holding Recall Elections in any County to Determine Whether Licenses Shall be Revoked or Continued Therein."

Section Two of Chapter 17257 is the part 'assaulted' in this litigation and is as follows:

"Section 2. For the purpose of this Act, coin-operated devices are defined and classified as follows:

"(1) Automatic coin-operating vending and amusement machines with premium features, which may or may not vend for each coin deposited a standard article of merchandise having a recognized retail value, and which at intervals vend checks, tokens, coins, or orders which may or may not be exchanged for additional merchandise. Hereinafter this type will be referred to as automatic vendors.

"(2) Coin-operated skill machines (commonly referred to as Pin-Games, Marble Tables, and similar devices of this type which may have a skill feature) which may or may not pay a reward for skillful operation or upon which operation, premiums may or may not be given for high score or

making certain combinations. Such premiums may be awarded either automatically by the machine in the form of checks, tokens, or orders, which designate the value of the premium or premiums or may be indicated by a score card attached to the machine. Hereinafter this type shall be referred to as skill machines.

"(3) Trade Machines. These machines have no automatic vending feature, although at intervals indicate that patron is entitled to receive premiums. Hereinafter this type will be referred to as trade machines. Only such types of machines as are hereinabove described and referred to as automatic vendors, skill machines and/or trade machines are covered by this Act. Nothing herein contained shall be construed to apply to any coin-operated machine or device which returns amusement, entertainment or some service or article of value or a combination of the above, uniformly as to quantity and quality, upon each insertion of a coin into the same, nor to any coin-operated telephone.

"(4) 'Other Machines.' All other coin-operated machines or slot machines not covered by any of the above definitions, classifications, or descriptions, shall be classified as 'other machines' and shall be subject to an occupational license tax as hereinafter provided.

"(5) This Act shall not apply to coin-operated telephones nor to U. S. stamp machines.

"(6) The Comptroller is hereby authorized and directed to make and promulgate such reasonable rules and regulations as may be necessary to secure and determine uniform classifications for the purposes of this Act, of all devices and/or machines within the State of Florida."

"Both the 'operator' and the 'location operator' of any machine as defined in Section Three of the Act are required to secure a license for that purpose and it is made the duty

of the Comptroller to prescribe rules for and to administer the said Act." The order appealed from was granted on the ground that the coin-operated devices named in Section Two constituted lotteries such as were inhibited by Section Twenty-three of Article Three of the Constitution which provides that, "Lotteries are hereby prohibited in this State."

We are, therefore, faced with the sole question of whether or not coin-operated devices as defined by Section Two of Chapter 17257, Acts of 1935, constitute lotteries as defined by Section Twenty-Three of Article Three of the Constitution.

Webster defines a lottery as a scheme for the distribution of prizes by lot or chances. Worcester defines it as a distribution of prizes and blanks by chance, a game of hazard in which small sums are ventured for the chance of obtaining a larger value either in money or in other articles. Other standard dictionaries are to like effect. The courts have defined a lottery as the payment of a pecuniary consideration, and it is determined by lot or chance, according to some scheme held out to the public, what and how much he who pays the money is to have for it, that is to say a scheme by which a result is reached by some action or means taken, and in which result man's choice or will has no part, nor can human reason, foresight, sagacity, or design enable him to know or determine such result until the same has been accomplished. 17 R. C. L. 1210 and cases cited.

In Horner v. United States, 147 U. S. 449, 13 Sup. Ct. 409, 37 L. Ed. 237, the Court called a lottery a scheme for raising money by selling chances to share in a distribution of prizes; more specifically a scheme for the distribution of prizes by chance among persons purchasing tickets, the cor-

respondingly numbered slips, or lots, representing prizes or blanks, being drawn from a wheel on a day previously announced in connection with the scheme of intended prizes. In law the term lottery, said the Court, embraces all schemes for the distribution of prizes by chance, such as policy playing gift exhibitions, prize concerts, raffles at fairs, et cetera, and includes various forms of gambling.

In many states the Legislature has undertaken to define the term lottery. Here is a typical legislative definition: A scheme for the distribution of property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether called a lottery, raffle, or gift enterprise, or by some other name. People, *ex rel.* Ellison, v. Lavin, 179 N. Y. 164, 71 N. E. 753; 66 L. R. A. 601.

Lotteries in a legal sense, like many other institutions, have experienced an interesting evolution. In some jurisdictions the term lottery is employed in its generic sense, while in others it has its technical implications. Lotteries are of ancient origin. They were common in the festivals of Roman Emperors, were used by the Feudal princes of Europe, by the Court of Louis XIV, and were appropriated in the Italian republics of the Sixteenth Century to encourage the sale of merchandise. They early became popular in France, Belgium, Sweden, and Switzerland as a means of raising government funds. They were established in England as early as 1569 and were one of her most popular sources of revenue. They were at one time employed in every state of the Union and in the District of Columbia to raise money for public purposes, the erection of buildings, making public improvements, for educational and sometimes for religious purposes. In 1828 the Territorial Legislature of Florida created Union Academy in Jackson County and

authorized its trustees to raise $1000.00 for its benefit by lottery. Page 279, Acts of 1828. During the Revolution the Continental Congress on one occasion authorized the raising of funds by lottery. Stone v. State of Mississippi, 101 U. S. 814, 25 L. Ed. 1079.

Under the common law lotteries and all forms of gaming were pronounced illegal only when they became public nuisances. In 1698 an Act of Parliament declared the former to be such. In Great Britain and in every State in the United States they have been suppressed by constitutional provision as the result of popular uprising against them early in the latter half of the preceding century.

The form of lottery against which popular indignation was directed had its peculiar implications. The Legislature would first grant a charter to a lottery company for a period of years in consideration of a stipulated sum in cash, annual payment of further sum, and a percentage of the receipts from the sale of tickets. Under such a charter the company was authorized to sell tickets, or certificates of subscription to issue receipts therefor, and to contract with agents to sell them on commission or otherwise. The tickets or certificates entitled the holders to such articles as might be awarded them, the distribution to be made in public, after advertising, by the casting of lots, or by lot, chance, or otherwise in such manner as directed by the by-laws of the corporation. The holders of tickets in such lotteries could sell them or any interest in them and the purchasers were entitled to participate in the distribution of any prize under them. Money, lands, and merchandise of all kinds were distributed by such lotteries. Under these charters lottery companies devised every scheme and device to ensnare the public, regardless of age, class, or station. Through them the gambling, cheating spirit became

dominant and their baneful influence spread like a plague throughout the country.

It was such lotteries as these that the Supreme Court of the United States was concerned with in Phelan v. Virginia, 8 How. (U. S.) 163, 12 L. Ed. 1030, when it said:

"Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places but the latter infests the whole community; it enters every dwelling; it reaches every class; it prays upon the hard earnings of the poor; and it plunders the ignorant and the simple."

Lotteries are generally classified as a species of gambling, though the statutes dealing with them and other forms of gambling have recognized a clear line of distinction between them. This distinction has been recognized, by different degrees of punishment and by the ascription of different attributes to each. People v. Reilly, 50 Mich. 384, 15 N. W. 250; Ex Parte Kameta, 36 Ore. 251, 60 Pac. 394, 78 A. S. R. 775.

In many jurisdictions with constitutional and statutory provisions inhibiting lotteries the statutes have attempted to define them and often such definitions are all inclusive embracing many species of gambling. Our constitutional provision suppressing lotteries does not attempt to define them but in view of the prevailing conditions as supported by contemporaneous and subsequent history we must conclude that the people of this state had in mind such a lottery as was referred to in Phalen v. Virginia, supra.

This conclusion is abundantly supported by the legislative history of the State on the subject of lotteries and other forms of gambling. Section 23 of Article III first appeared as Section 20 of Article IV of the Constitution of 1868 and

was carried into the Constitution of 1885 in the form now brought in question. The first session of the Legislature under the Constitution of 1868 enacted Chapter 1637, the same being an Act to provide for the punishment of crime, and proceedings in criminal cases. Chapter 10 of this Act treats and punishes "offenses against public policy." The offenses so treated and punished are the owners and operators of lotteries, the owners of buildings used for lottery purposes, those selling lottery tickets, those advertising lottery tickets, regulates the forfeiting of lottery prizes, punishes horse racing, and those guilty of disclosing the contents of telegraphic messages to others than the consignee.

Chapter 4373, Acts of 1895, was an Act to prohibit lotteries and games of chance, and to prescribe penalties therefor. With respect to lotteries it carried substantially the same provisions as Chapter 1637, Acts of 1868, but more detailed. It clearly distinguished lotteries from games of chance by difference in characterization and in punishment. We have had no other legislation treating specifically the subject of lotteries.

The first statute enacted on the subject of gambling was Number 55, approved February 10, 1832, Section 46 of which prohibits and punishes any person found playing and betting at any game of cards, dice, checks, or billiards, or any other article or instrument used for the purpose of betting. Horse-racing, shooting with guns, wrestling, jumping, foot-racing, five playing, pitching quoits, and such like were specifically excepted from the terms of this Act.

In 1853 by Chapter 542, approved January 8, the Legislature modified the punishment imposed by the foregoing statutes but no other law on the subject was enacted until 1881 when the Legislature passed Chapter 3277, being an Act to suppress gaming. This Act prohibited and punished

those guilty of keeping gaming tables, rooms, houses, booths, tents, shelters, or any other place for the purpose of gaming.

Sections 5505, 5508, 5509, 5510, 5511, and 5514, Revised General Statutes of 1920, Sections 7663, 7666, 7667, 7668, 7669, and 7672, Compiled General Laws of 1927, all treat different phases of gambling and lotteries and some of them are parts of the Acts previously referred to. Chapter 14832, Acts of 1931, legalizing pari-mutuel betting on horse-racing, affecting another phase of gambling, is another Act of the same character. All of these Acts show clearly that the Legislature recognized the distinction between lotteries and other species of gambling both before and after the adoption of Section 23 of Article III and it is significant that its right to regulate the latter has never been challenged except in cases where the inhibition against lotteries is alleged to have been infringed. The organic law having used the word lottery in its generic sense and the Legislature never having defined it to include other forms of gambling, but having constantly acted on the theory that it did not embrace them, we do not feel warranted in ascribing to it a meaning other than was apparently in the mind of the people when it was embraced in the Constitution.

The Constitution of Florida is a limitation of power and while the Legislature cannot legalize any gambling device that would in effect amount to a lottery, it has inherent power to regulate or to prohibit any and all other forms of gambling, such distinction being well defined in the law. This view is in line with the holding in other states having constitutional provisions similar to ours. People v. Reilly, 50 Mich. 384, 15 N. W. 520, 45 Rep. 47; 38 C. J. 286; People v. Monroe, 349 Ill. 270, 182 N. E. 439, 85 A. L. R. 622; Ex Parte Pierotti, 43 Nev. 243, 184 Pac. 209. In the latter case the court said:

"It is true that lotteries and unlawful gaming partake of the same mischief. They belong to the same family. Chance is the material element in both. The Legislature is prohibited from legislating upon one and permitted by virtue of its inherent powers to legislate upon the other as the occasion arises. This for the reason of the wide distinction or contrast between the vice of lotteries, which infests the whole community, and the mischief or nuisance of gaming, which is generally confined to a few persons and places. To say that the Legislature is without power to legislate upon the subject of gaming is to set at naught the basic power of the legislative branch of the government."

In the case notes in 26 A. L. R. 724, 39 A. L. R. 1036, 48 A. L. R. 1121, 57 A. L. R. 424, annd 41 A. L. R. 1484, many cases are digested where the court held that lotteries did not include every scheme where the element of chance, lot, or prize was prevalent. These cases all support the conclusion we have reached here which is a legal judgment and in no way concerns the policy of the Act.

"What Section 23 of Article III actually did was to suppress such legalized lotteries as are referred to in the forepart of this opinion, the primary test of which was whether or not the vice of it infected the whole community or country, rather than individual units of it. Any gambling device reaching such proportions would amount to a violation of the Constitution but it is not alleged or shown that the devices legalized by Chapter 17257 come in this class.

Chapter 17257 on its face does not clearly offend against organic law nor do the coin-operating vending machines described in Section 2, the use of which is restrained, constitute lotteries *per se*. It may be that some of them or possibly all of them in their operation will become such; but we leave that question to be determined when a specific

case arises. This holding is not in conflict with, but is supported by, State v. Vasquez, 49 Fla. 126, 38 So. 830, and other cases relied on by appellee.

Reversed.

WHITFIELD, C. J., and BROWN and DAVIS, J. J., concur.

BUFORD, J., dissents in part.

BUFORD, J. (dissenting in part).—I find myself unable to agree with my associates in whole, either in reasoning or conclusions by which they have reached the result of reversing the order of the Court below.

From the provisions of the Act which are fully set out in the majority opinion, it is observed that the purpose of the Act is to make it lawful, upon the payment of the required license, to operate in this State, first:

"Automatic coin-operating vending and amusement machines with premium features which may or may not vend for each coin deposited a standard article or merchandise having a recognized retail value and which at intervals vend checks, tokens, coins or orders which may or may not be exchanged for additional merchandise";

Second: "Coin-operated skill machines, such as Pin-Games, Marble Tables and similar devices which have a skill feature and which may or may not pay a reward for skillful operation, or upon which operation premiums may or may not be given for high score or making certain combinations, and where the premiums may be awarded either automatically by the machine in the form of checks, tokens or orders which designate the value of premium or premiums or may be indicated by a score card attached to the machine";

And third: "Trade machines which have no automatic vending feature although at intervals the machines indicate that the patron is entitled to receive premiums."

It is further provided that nothing in the Act shall be construed to apply to any coin-operated machine or device which returns amusement, entertainment or some service or article of value or a combination of such uniformly as to quantity and quality upon each insertion of a coin into the same, nor to any coin-operated telephone.

Sub-section 4 of Section 2 defines what shall be known as *other machines.*

It is clear that in each of the classifications above mentioned it was the intent of the Legislature to permit the operation of slot machines, or other machines to be operated in such manner by the use of coins that the player depositing the coin would be, upon the play resulting in a certain manner, entitled to receive a greater sum than the sum deposited.

In other words, paragraph (1) of Sec. 2 of the Act by its terms only applies to the operation of those machines which are commonly recognized as gambling devices and in which the element of chance to win more than is deposited is the dominant feature and is the feature which urges the public to play the machine and neither skill, will or judgment plays any part as to results. The machines which are operated solely as vending machines and without offering any element of chance to win something other than the specific article sought to be purchased are definitely excluded from the operation of the Act.

Now the first question for us to determine is whether or not the Act violates or is in conflict with the provision of Section 23 of Article III of the Constitution.

In the case of State v. Vasquez, 49 Fla. 126, 38 Sou. 830, this Court said:

"A statute licensing 'lung-testers, striking machines, weighing, chewing gum stand, automatic penny in the slot

machine or any other device of a similar nature' under a constitution prohibiting lotteries will not be construed to license the operation of a machine in which the element of chance largely predominates."

In the case of Kirk v. Morrison, Sheriff, 108 Fla. 148, 146 Sou. 215, we held:

"The affidavit before us in the present case is repugnant and inconsistent in its allegations in that in one portion of it the unconditional allegation is made that the defendant kept a 'slot machine' for the purpose of gaming or gambling. But in a subsequent portion of the same affidavit it is plainly stated that the slot machine in question is not *per se* a gambling device nor permitted to be used for gambling, but is designed and used only for the innocent purpose of vending mints, not involving a playing upon the same 'for money or other valuable thing' in violation of the statute prohibiting the keeping of a 'slot machine' for unlawful purposes.

"If we accept as true the allegations of the latter portion of the affidavit, the 'slot machine' kept by the defendant was not a gambling device *per se* because these latter allegations concede, on the face of the charge itself, that there is no element of chance for the winning or losing of money, or any check or memoranda calling for money, 'or other valuable thing' through the playing of same in the ordinary way it is designed to operate, if such machine as constructed, remains unchanged.

"Neither is it charged in the affidavit anywhere that, though not designed for gambling, that the machine is being suffered or permitted to be used or kept for use for gaming or gambling. The mere keeping of a slot machine under such circumstances cannot therefore be considered as unlawful *per se,* under Section 7657 C. G. L., *supra.* People

v. Jennings, 257 N. Y. 196, 177 N. E. 419; Overby v. Oklahoma City (Okla. Cr. Appl.), 287 Pac. 796.

"In some States every 'slot machine' is by statute to be deemed a gambling device. But in States such as ours, where no such statutory definitions exist, the use to which a 'slot machine' is put, or designed to be put, must determine its character as a device for gaming or gambling. The courts are not permitted to take judicial notice that every slot machine as such, is a gambling device. See Note, 20 Ann. Cas. 131."

The term "Lottery" has been variously defined. Some of the definitions are as follows:

"The term 'lottery' has no technical meaning in the law distinct from its popular signification. A lottery is a scheme for the distribution of prizes by chance. Dunn v. People, 40 Ill., 465, 467; Thomas v. People, 59 Ill. 160, 163; Commonwealth v. Mackay, 58 N. E. 1027, 177 Mass. 345; State v. Shorts, 32 N. J. L. 398; 90 Am. Dec. 668; Rolfe v. Dalmar, 30 N. Y. Super Co. 80; People v. Noelke, 94 N. Y. 137, 46 Am. Rep. 128; State v. Willis, 78 Me. 70, 2 Atl. 848, Randle v. State, 42 Tex. 580; Quatsoe v. Eggleston, 42 Ore. 315, 71 Pac. 66."

"A lottery is a scheme for the distribution of prizes by chance, or the distribution itself when the latter depends on chance. Commonwealth v. Sullivan, 146 Mass. 142, 15 N. E. 491; Holman v. State, 2 Tex. App. 610, 28 Am. Rep. 439."

" 'Lottery' is defined as a hazard in which sums are ventured for a chance of obtaining a greater value. Lotteries are nuisances in the eye of the common law. *In re* Smith, 54 Kan. 702, 39 Pac. 707; Ford v. State, 85 Md. 465, 37 Atl. 172, 41 L. R. A. 551, 60 Am. St. Rep. 337."

"A 'lottery' may be defined to be a game by which a per-

son paying money becomes entitled to money or other things of value on certain contingencies, determinable by lot cast in a particular way by the manager of the game." Chavannah v. State, 49 Ala. 396.

"A lottery is a scheme for the distribution of property by chance or lot among persons who have paid or agreed to pay a valuable consideration for the privilege of participating in such scheme." New Orleans v. Collins, 52 La. Ann. 973, 27 So. 532.

"To be a criminal lottery there must be a consideration, and when small amounts are hazarded to gain large amounts, and the results of the winning is to be determined by the use of a contrivance of chance in which neither choice nor skill can exert any effect, it is gambling by lot, or a prohibited lottery." Johnson v. State, 137 Ala. 101, 34 So. 1018.

"There are three essential ingredients in a lottery—consideration, prize and chance." Equitable Loan and Security Co. v. Waring, 117 Ga. 599, 44 S. E. 320, 62 L. R. A. 93, 97 Am. St. Rep. 177.

"A lottery is a scheme by which a result is reached by some action or means taken in which result man's choice or will has no part, nor can human reason, sagacity, foresight, or design enable him to know or determine such result until the same has been accomplished." Price v. Elliott, 74 Mich. 264, 41 N. W. 916, 3 L. R. A. 403, 16 Am. St. Rep. 640.

"Where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out to the public, what the party who pays the money is to have for it, or whether he is to have anything, it is a lottery." State v. Lovell, 39 N. J. L. 458; State v. Clark, 33 N. H. 329, 66 Am. Dec. 723; Hull v. Ruggles, 56 N. Y.

424; Swain v. Bussell, 10 Ind. 438; McDonald v. U. S., 63 Fed. 426; Cross v. People, 18 Colo. 321, 32 Pac. 821, 36 Am. St. Rep. 292; Long v. State, 74 Me. 565, 22 Atl. 4, 12 L. R. A. 425, 28 Am. St. 268; State v. Overton, 16 Nev. 136; State v. Mercantile Assn., 45 Kan. 351, 25 Pac. 984, 11 L. R. A. 430, 23 Am. St. Rep. 727; Wilkinson v. Gill, 74 N. Y. 63, 30 Am. Rep. 264, Yellow-Stone Kit v. State, 88 Ala. 196, 7 So. 338; 7 L. R. A. 599, 16 Am. St. Rep. 38; Kohn v. Koehler, 96 N. Y. 362, 48 Am. Rep. 628.

"A distribution of prizes and blanks by chance; a game of hazard in which small sums are ventured for the chance of obtaining a larger value either in money or other articles." Worcester's Dictionary.

"A scheme for the distribution of prizes by chance." Webster's Dictionary.

"A kind of game of hazard wherein several lots of merchandise are deposited in prizes for the benefit of the fortunate." Rees' Cyclopedia.

"A sort of gaming contract by which, for a valuable consideration, one may by favor of the lot obtain a prize of value superior to the amount or value of that which he risks." American Cyclopedia.

"In one respect we think all these definitions are too narrow to cover some of the modern devices resorted to in order to evade the lottery laws, and that whether the consideration paid or given for the token or chance to win something, generally called a 'Prize' consists of money or any other thing of value, makes no difference." Long v. State, 74 Md. 565, 22 Atl. 4, 12 L. R. A. 525, 28 Am. St. Rep. 268; Equitable Loan & Security Co. v. Waring, 117 Ga. 599, 44 S. E. 320.

"But there may be an adventure or hazard without a lottery. Every throw of the die, even for an ordinary

wager, is an adventure or hazard, but it has never yet entered the mind of any man that it constituted a lottery. A raffle of watches or other articles, of which the owner fixes the value, which is equally apportioned among the adventurers, and the chances are usually determined by the throwing of dice, pieces of coin, or some substitute is not a lottery." State v. Pinchback (S. C.), 2 Mill Const. 128, 130.

"A division of property under some circumstances may be made by lot, and yet not be a lottery. Sacred history contains several instances where property has been parted and divided by lot; Psalms XXII, 18; Matthew XXVII, 35; Acts I, 26; Leviticus XVI, 8. The term as used in the criminal law refers to something in which there are supposed prizes and blanks. On the other hand, the disposal of any species of property, by any of the schemes or games of chance popularly regarded as innocent, comes within the terms of the law. The raffles which occur daily at the street corners, in bar rooms, at fairs, and at other places, are as clearly violations of the criminal law as the most elaborate and carefully organized lotteries by which the ignorant and credulous are swindled out of their hard earnings." Commonwealth v. Manderfield (Pa.), 8 Phila. 457, 459.

"A lottery is a game of hazard or chance, in which small sums are ventured for the chance of obtaining a larger sum of money. Where a nickel-in-the-slot machine was so constructed that if the nickel, in falling into the machine, touched certain springs, a valve would be opened, and the machine would pay a certain amount of money in excess of the deposit, the nickel remaining in the machine, and the proportion of times when one playing the machine would win was less than the times when he would lose, such ma-

chine constituted a lottery. Pendergast v. State, 41 Tex. Cr. Rep. 358, 57 S. W. 850.

"The use of a slot machine where the element of chance determines whether the prizes ar to be given, brings the operation thereof under the definition of lottery, whether the prizes given are stock in trade of licensed establishments or not." City of New Orleans v. Collins, 52 L. Ann. 973, 27 So. 532.

There is no ambiguity in our constitutional provision prohibiting lotteries and we know of no rule of construction which will permit us to determine that the intent of the Constitution is that the section should apply to certain classes of lotteries and not to others. It may have been that the framers of the Constitution had in mind a particular kind of lottery when they adopted this provision.

It occurs to me that the definition given by the Supreme Court of Michigan in the case of Price v. Elliott, *supra,* is a clear, concise and logical definition of "lottery" which should be applied in determining what is meant by this section of our Constitution, that is:

"A lottery is a scheme by which a result is reached by some action or means taken in which result man's choice or will has no part, nor can human reason, sagacity, foresight or design enable him to know or determine such result until the same has been accomplished."

In the majority opinion it is said:

"What Section 23 of Article III actually did was to suppress such legalized lotteries as are referred to in the forepart of this opinion, the primary test of which was whether or not the vice of it infected the whole community or country, rather than individual units of it. Any gambling device reaching such proportions would amount to a viola-

tion of the Constitution but it is not alleged or shown that the devices legalized by Chapter 17257 come in this class."

We have repeatedly held that what everybody knows this Court is assumed to know. Therefore, it follows that we are assumed to know that the machine described in paragraph (1) of Section 2 of the Act is a machine which constitutes a gambling device and the use of which for such purposes has infected the whole community and country. They are found in operation in many places in almost every community. They constitute an habitual and almost ever present lure to the gambling instict of those members of the public who are least able to indulge such inclination. It is also a matter of general knowledge that such machines are referred to as one-armed bandits because they are so constructed that there is nowhere an even chance for the player as against the operator; that they constantly pay large weekly dividends to the operator and that in the operation thereof by the player there is involved no element either of judgment or of skill. In this latter respect they differ from the machines described in paragraph (2) of Section 2 of the Act designated as "coin-operated skill machines." As to these latter machines the method of operation, I think, would determine whether or not they constitute lotteries. The same is true of the machines coming within the provisions of paragraph (3) of Section 2 of the Act. Therefore, the operation of such machines should not be enjoined by blanket injunction, but it should be left to the enforcement officers to determine whether or not they are being so operated as to constitute lotteries under the judicial definition of "lottery." And, as to these machines, I concur with the reasoning and the result reached in the majority opinion. In addition to what is said there, however, as follows:

"Both the 'operator' and the 'location operator' of any machine as defined in Section 3 of the Act are required to secure a license for that purpose and it is made the duty of the Comptroller to prescribe rules for and to administer the said Act."

I would add that I do not think that the provision of Section 12, as follows: "Provided, further, that nothing herein shall be construed to mean that more than one occupational tax may be required from any one operator, and not more than one location tax may be required of each machine, in the same county or city," is in conflict with this holding. I think that this provision of Section 42 means that one who pays the occupational tax as an operator can not be required to pay more than one such tax to the State or more than one such tax to each county and municipality and that when an "operator" and a "location operator" have each paid the location tax provided for in Section 5 of the Act required to be paid as occupational license tax on each machine that neither can be required to pay an additional tax on the same machine, although it may be moved to some other location in the same county or municipality. In other words, the provision of Section 12 only means that after the tax provided for in Section 5 has been paid for the operation of a particular machine in a particular county or municipality that no additional tax should be required of that operator, or the location operator, for operating the same machine in the same county or municipality but at some other location. Whether or not the provisions of the Act constitute wise legislation or whether or not the purpose of the Act is a laudable one are matters for the Legislature and not for the courts to determine. It is, of course, the duty of the Legislature to support and defend the Constitution and its provisions, but, regardless

of what the legislative action may have been, it is the duty of the courts always, and under all conditions, to respect, uphold and enforce the provisions of organic law as written in the Constitution fairly and impartially and without reference to expediency.

Having reached this conclusion, I think we should hold that the operation of the machines constructed and to be used in the manner provided for in paragraph numbered (1) of Section 2 of the statute would constitute lotteries and that, therefore, the Act offends against Section 23, Article III of the Constitution and is void.

It, therefore, follows that my view is that the decree of the court below should be affirmed insofar as it applies to the machines referred to in the Act as automatic vendors described in paragraph (1), Section 2 of the Act, and should be reversed insofar as it applies to other machines described in the Act without prejudice to any law enforcement officer to abate the operation of any coin-operated machine which comes within the purview of the definition of "lottery" as defined in Price v. Elliott, *supra,* and which definition is quoted above.