## STATE OF FLORIDA v VITELLI, et al.

Case Nos. 85-59590, 85-65742, 85-67361, 85-65807, 85-64478, 85-64174 and 85-74751 (Consolidated)

County Court, Dade County

November 12, 1985

### APPEARANCES OF COUNSEL

**Richard Shiffrin, Jimm Menadier, Ronald Waterstreet,** Assistant State Attorneys, for plaintiff.

**Bruce Rogow** and **Maurice Rosen** for defendants.

### OPINION OF THE COURT

MORTON L. PERRY, County Judge.

This cause came on to be heard on October 28, 1985 on defendants' Motion to Dismiss charges filed against them for violation of state and county laws relating to the conduct of bingo games.

Defendants, Abraham Cooper, Alan Perez, and Gene Dasta are each charged with violation of Florida Statute 849.093 and violation of certain provisions of Charges 21-134 and 21-135 of the Metropolitan Dade County Code as relate to the conduct of bingo games. Defendant Judith Vitelli is charged with violation of the aforenoted statute and

defendant William Tarpinian is charged with violations of the county code.

The above actions were consolidated by the parties for hearing before this court.

The violations of the state statute relating to provision 849.093(1)(c) thereof is set forth as follows:

"Charitable, nonprofit or veteran's organization" means an organization which has qualified for exemption from federal income tax as an exempt organization under the provisions of 50l(C) of the Internal Revenue Code of 1954; which is engaged in charitable, civic, community, benevolent, religious or scholastic work or other similar activities; and which has been in existence and active for a period of 3 years or more.

Sections 21-134 and 21-135 of the Metropolitan Dade County Code requires the maintaining of adequate records of daily bingo activity on a per game basis; and requires the posting of the names of all persons operating or assisting in the operation of a bingo game as well as financial information relating to gross receipts collected per each bingo game and the net receipts collected but not awarded as prizes.

## THE DEFENDANTS CONTEND THAT THE STATUTE CREATES AN UNCONSTITUTIONAL DELEGATION OF AUTHORITY

Counsel for the defendants argues that the provision of Section 849.093(1)(c) Florida Statutes requiring Internal Revenue Code Title 26 U.S.C. Section 50l(c) status as a prerequisite to Florida statutory compliance for operating bingo is an unconstitutional delegation of State legislative authority in violation of Article II, Section 3 and Article III, Section 1 of the Florida Constitution. Therefore, he contends Section 849.093(1)(c) is unconstitutional and all prosecutions brought pursuant to that provision of the statute must be dismissed.

He states that the enactment of 849.093(1)(c) which became effective October 1, 1984 is an unconstitutional delegation of authority by the Florida legislature. He asserts that whether an organization will qualify for 50l(c) status depends upon present and future federal statutory and administrative law, including Tax Decisions and Internal Revenue Service rulings. He contends that this statute provides for future federal law regarding qualification for 50l(c) status to govern this Florida statute; and, thus constitutes an unconstitutional delegation of legislative power. He cites the case of *Florida Industrial Commission v. State*, 21 So.2d 599 (Fla. 1945).

108

This case involved the Florida Unemployment Compensation Law which adopted certain provisions of Title IX of the Federal Social Security Act.

The pertinent provisions of this Florida Law are cited on page 603 of the aforenoted opinion and exempt from coverage under the Florida Unemployment Compensation law the following:

(i) "Any employer, employment, or service which is not included within the operation of Title IX of the Federal Social Security Act or amendments thereto."

The Court further held in regard to this section:

"As to this last quoted amendment we might observe that it is within the province of the legislature to approve and adopt the provisions of federal statutes, and all of the administrative rules made by a federal administrative body, that are in existence and in effect at the time the legislature acts; but it would be an unconstitutional delegation of legislative power for the legislature to adopt in advance any federal act or the ruling of any federal administrative body that Congress or such administrative body might see fit to adopt in the future."

In this regard, the Court would note and counsel have agreed that the provisions of 50l(c) as contained in the Internal Revenue Code were the same at the time of the enactment of Florida Statutes 849.073(1)(3) requiring 50l(c) exemption as exists today.

It does not appear, therefore, that the legislature in adopting 849.093(1)(c) adopted in advance a federal act or ruling. In that the provisions of 50l(c) have not changed since the adoption of this statute to this date the court is not called upon to make a determination of whether the defendants were called upon to conform to a future ruling made by the Internal Revenue as regards this 50l(c) provision.

Unlike the aforenoted Florida Industrial Commission case which sets forth the adoption of certain provisions of Title IX of the Federal Social Security Act or *amendments thereto* (emphasis supplied) to the Florida Unemployment Compensation Law, Florida Statute 849.093(1)(c) makes no such reference to future federal acts.

However, the Florida Supreme Court nonetheless held the said Florida Statute which adopted provisions of the Federal Social Security Act as worded to be constitutional when adopted by the legislature although unconstitutional as applied.

The Florida Supreme Court has more recently held that the State

legislature may adopt regulatory and statutory standards of the federal government; but these standards must be in existence at the time of the adoption.

In the case of *Victor Adowe and Jerome Wexler v. State of Florida*, 408 So.2d 560, (Fla. 1982) the court restated its position taken in the Florida Industrial Commission case when it held on Page 570:

"The delegation doctrine is grounded on the constitutional maxim that the legislature has the sole authority and responsibility to make the laws. *State v. Atlantic Coast Line Railway Co.*, 56 Fla. 617, 47 So. 969 (1908). Unless the constitution otherwise authorizes, the legislature cannot delegate this responsibility to any other person or body. *State v. Welch*, 279 So.2d 11 (Fla. 1973). The legislature may, as it has in the past, adopt the regulatory and statutory standards of the federal government, but these standards must be in existence at the time of the adoption. Any attempt to incorporate a law as a part of this state's body of laws prior to its creation by the appropriate federal authority is an unconstitutional delegation of the legislative power." *Florida Industrial Commission v. State*, 155 Fla. 772, 21 So.2d 599 (1945).

## THE DEFENDANTS CONTEND THE STATUTORY REQUIREMENT CREATES AN IRREBUTTABLE PRESUMPTION IN VIOLATION OF DUE PROCESS OF LAW

Counsel for the defendants contends that Section 849.093(1)(c) creates an irrebuttable presumption that an organization cannot be a charitable organization unless it "has qualified for exemption from federal income tax as an exempt organization under the provisions of 50l(c) of the Internal Revenue Code." That presumption took effect on October 1, 1984.

He reasons that if a local organization which would otherwise qualify for conducting bingo games under Florida law did not have 50l(c) status; or, if such a local organization was unable to muster its meagre resources to fund such an application, Florida Statute 849.093(1)(c) would presume the organization served no charitable purpose. "Surely, it would be fairer for Florida to make an individualized determination, instead of applying an irrebuttable presumption" argues defendant's attorney.

He cites the case of *Markham v. Fogg*, 458 So.2d 1122 (Fla. 1984), in which the Court wrote on Page 1125:

"We have stated that the test to determine the constitutionality of a mandatory presumption is three fold in measuring constitutionality under the Due Process Clause. These tests are as follows:

**110**

(1) Whether the concern of the legislature was reasonably aroused by the possibility of an abuse which it legitimately desired to avoid.

(2) Whether there was a reasonable basis for a conclusion that the statute would protect against its occurrence.

(3) Whether the expense and other difficulties of individual determinations justify the inherent imprecision of a conclusive presumption.

Counsel contends that the 50l(c) provision is violative of the Fourteenth Amendment and Article I, Section 9 of the Florida Constitution insofar as it creates an irrebuttable presumption that if, on October 1, 1984, an otherwise charitable organization did not have 50l(c) status, that such organization was not entitled to conduct bingo games for fund raising purpose pursuant to Florida law.

## THE DEFENDANTS CONTEND THAT THE STATUTORY REQUIREMENT DOES NOT BEAR A RATIONAL RELATIONSHIP TO A LEGITIMATE GOVERNMENTAL PURPOSE AND THUS VIOLATES THE FOURTEENTH AMENDMENT AND ARTICLE I, SECTION 2 OF THE FLORIDA CONSTITUTION

The defendants further contend that Section 849.093(1)(c) creates two classifications. The first are charitable and nonprofit organizations which are not 50l(c) recognized, and the second are similar organizations which are so recognized.

They argue that the Florida Supreme Court, acknowledging United States Supreme Court authority, has stated the rule which is as follows:

"For a statutory classification to satisy the equal protection clauses found in our organic documents, it must rest on some difference that bears a just and reasonable relation to the statute in respect to which the classification is proposed. *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); cf. *Royster Guano Co. v. Virginia*, 253 U.S. 412, 40 S. Ct. 560, 64 L.Ed. 989 (1920). *Rollins v. State*, 354 So.2d 61, 63 (Fla. 1978).

They set forth that other than having received 50l(c) status, which serves national tax law purposes, whether an organization had obtained that status on October 1, 1984, bears no reasonable relation to any legitimate state interests served by the statutory scheme.

Counsel for the defendants conclude that even assuming that the statutory scheme wanted to insure that charitable organizations con-

ducting bingo games were bona fide, the added imposition of the 50l(c) qualification does not accomplish that goal. He asserts that there are no practical differences between charitable organizations which have 50l(c) status and those who do not, save the status itself.

## UNCONSTITUTIONAL IMPAIRMENT OF CONTRACT

The defendants further contend that the 50l(c) requirement created a constitutional impairment as regards existing lease agreements on leased premises used for the conducting of bingo games.

They contend that the 50l(c) provision impaired those existing lease agreements affecting organizations for which the defendants served as volunteers in that such organizations could no longer conduct bingo games without first engaging in a time consuming procedure required in an attempt to obtain 50l(c) exemption under Internal Revenue regulations.

The defendants argue that the passage of the Florida Statute had the retroactive effect of impairing such private lease agreements and thus made their activity as volunteers in behalf of such organizations subject to criminal prosecution. Likewise 849.093(10) requires the lessee of the space used to conduct such bingo games to have obtained such exemption.

Those defendants charged with violations of the Metropolitan Dade County Code contend that sections 21-134 and 21-135, particularly as relates to the requirement that certain adequate records of daily bingo activity be kept on a per game basis, were unreasonable to comply with —if not beyond performance.

## TESTIMONY PRESENTED BY THE PARTIES

The attorneys for the parties presented witnesses in support of their contentions regarding the constitutionality of the statute and county bingo ordinances.

A brief review of such testimony relating to daily bingo operations and bingo lease provisions concerning such activity at the Sky Lake Mall in Dade County appears to illustrate, though not illuminate, the conditions under which bingo games are conducted at that establishment.

It would appear from the testimony presented that the Sky Lake Mall leases approximately 8,000 square feet to a lessee which in turn leases the premises to various charitable organizations. Such lessee must meet provisions of 849.093(10) and be exempt under 50l(c).

According to the testimony of Howard Finklestein, general manager

112

of the Sky Lake Mall Bingo Club, three charitable organizations conduct bingo games on a twice weekly basis and a fourth such organization conducts bingo games on the seventh day. Florida law prohibits charitable organizations from conducting bingo games more than twice per week.

Mr. Finklestein testified that bingo is conducted seven days per week and that 120 games are played daily. He stated that such games are conducted by four or five volunteers, and that a number of those volunteers belonged to more than one charitable organization which conducted bingo games on the Sky Lake Mall premises. Mr. Finklestein indicated that the operation of bingo games daily covered 14 hours.

Under 849.093(7) each person involved in the conduct of any bingo game must be a bona fide member of the organization sponsoring such game and may not be compensated in any way for operation of such bingo game.

Although he described himself as the general manager of the Sky Lake Bingo Club, Mr. Finklestein stated that he received $200.00 per week to maintain bingo equipment "which often breaks down". He said that this maintenance service was performed by him during afternoon hours. He stated that he was not reimbursed for the additional 44 hours per week that he served on the Sky Lake Mall premises as a volunteer engaged in the conduct of bingo games.

Although he serves as the self-professed manager of the Sky Lake Mall Bingo Club and would appear from his testimony to spend approximately 60 hours per week on the premises, Mr. Finklestein was unable to state the actual gross income realized nightly from bingo games.

He later estimated that $1,000.00 gross income was realized daily from the 120 games which were played by an average of 80 to 120 persons at a time. Under Florida Law, bingo awards may not exceed $50.00 per game and there may be no more than three jackpots of $250.00 during any given session. He stated that the total payment to the sponsoring charitable organization was $50.00 per night.

When asked by the Court if he could account for the difference between the annual gross income of $360,000 by his estimate and the relatively paltry total payment of $18,000 to charities which sponsored such bingo games, the witness was less than specific.

He stated that he was unaware of the amount of rental paid, but added that the printing bill for bingo cards and electricity for air conditioning expense was "very high".

Mr. Finklestein testified that bingo cards were sold in packages of 10 and that players would purchase additional such packages between the first and tenth games. He contended that he could not, therefore, report bingo card gross receipt income on a per game basis as required under Section 21-135(b) of the Metropolitan Dade County Code.

The difficulty claimed to be encountered by the witness in complying with this regulatory provision could be eliminated entirely if he sold bingo cards on a per game basis. The ordinance makes no requirement that the bingo operator conduct 120 games per day.

Metro Dade Detective Richard Jennings testified as to the broad scope of bingo games activity in Dade County. He stated that there were 12 such "commercial bingo operations" which were conducted in shopping centers in Dade County. He added that there were 180 church and school bingo games and 150 bingo games conducted in condominiums in Dade County.

## STATE AND COUNTY REGULATIONS AND BINGO GAMES

The regulation of bingo games as an exercise of the police power was noted in the case of *Carroll v. State of Florida*, 361 So.2d 144 (Fla. 1978). On page 147 the Court stated:

"The discretion of the legislature when exercised for the public welfare in selecting the subjects of police regulations and in determining the nature and extent of such regulation is limited only by the requirements of fundamental law that the regulations shall not invade private rights secured by the Constitution."

The Court added following on page 147 that "there is no constitutional right to conduct a gambling business", and therefore Section 849.093, Florida Statutes (1975) "does not—invade the private rights secured by the Constitution".

The Third District Court of Appeal in its aforenoted opinion went on to state on page 668:

"The Florida Supreme Court has ruled that the police power may . . . be exercised to protect the public against loss from fraudulent or unscrupulous practices in commercial and financial transactions particularly where the thing dealt with, or the method of dealing with it adapts itself to, deception or fraudulent impositions on the public."

## FINDINGS:

The rule is well-established that in determining the constitutionality of legislation the courts must give it a construction which will uphold

114

it rather than invalidate it, if there is any reasonable basis for doing so. Thus, it is the duty of the courts to so construe legislation as to save it from constitutional infirmities, and to effect a constitutional result if it is possible to do so. Accordingly, an act of the legislature should never be stricken down if there is any reasonable theory on which it can be upheld. (10 Fla. Juris II: Constitutional Law; 299)

I. The court has considered defendant's arguments and finds that 849.093(1)(3) does not create an unconstitutional delegation of authority by the Florida legislature for the reasons herein-before set forth.

II. The defendants have contended that if a local charitable organization which would otherwise qualify for conducting bingo games under Florida law did not have 50l(c) exemption status; or, if such a local organization was unable to muster its meagre resources to fund such an application, 849.093(1)(c) would presume the organization served no charitable purpose.

The Court would note in the case of *Markham v. Fogg*, 458 So.2d 1122 (Fla. 1984), supra, the test to determine the constitutionality of a mandatory presumption is three fold. The tests are set forth on page 1125 thereof and are as follows:

1. Whether the concern of the legislature was reasonably aroused by the possibility of an abuse which it legitimately desired to avoid.

An examination of case law regarding the concern of the legislature to protect legitimate charities and the public from abuse at the hands of unscrupulous bingo operators would indicate that the legislature legitimately desires to avoid such occurrence.

2. Whether there was a reasonable basis for a conclusion that the statute would protect against its occurrence;

The Florida legislature has adopted federal standards in order to more effectively regulate other areas of legislative concern under the police power including the subjects of drug control and transportation.

The legislature has seen fit to adopt the standards and experience as well as investigative and monitoring facilities available to the Internal Revenue Service to assure that only legitimate charities obtain 50l(c) federal exemption and thus become authorized to conduct bingo games in Florida.

This would constitute a reasonable basis for the conclusion that the statute would protect against abuse by unscrupulous bingo operators engaging in a legally sanctioned type of lottery activity under color of legitimate charity; and

3. Whether the expense and other difficulties of individual determinations justify the inherent imprecision of a conclusive presumption.

Application for approval by the Internal Revenue Service of 50l(c) exemption status is available to all charities which would operate bingo games for chaitable purpose. It would appear from the very comparison between federal 50l(c) charitable exemption approval and a corporation organized for charitable purpose under Florida law without benefit of federal sanction and supervision but subject only to less stringent reporting standards, that such federal standards far better serve to protect the public from unscrupulous operators who would conduct bingo games under guise of charitable purpose.

III. Counsel for defendants contends that certain of his clients held lease contracts to operate bingo games for charitable corporations or volunteers thereunder which have been impaired by 50l(c) requirements.

Counsel argues that his clients cannot engage in the conduct of charitable bingo games without being subject to criminal prosecution during the period when he must first apply for such exemption as well as permanently should the Internal Revenue Service refuse such 50l(c) exemption.

He thus claims that his contractual rights have been impaired by the inclusion of that 849.093(1)(c) requirement effective October 1, 1984 that such charity be exempt under 50l(c).

In the case of *Yellow Cab Company v. Dade County*, 412 So.2d 395 (Fla. 3rd DCA 1982) the Court held:

"The test of whether there has been an unconstitutional impairment of contract, in violation of the Florida Constitution, art. 1 S 10 or of the Constitution of the United States, art. 1, S 10, cl. 1, is essentially the same. As adopted by the Florida Supreme Court in *Pompano v. Claridge of Pompano Condominium, Inc.*, 378 So.2d 774 (Fla. 1980), the test requires the court to balance the nature and extent of impairment with the importance of the state's objective.

The United States Supreme Court in the case of *Energy Reserves Group, Inc. v. Kansas Power & Light Company*, 103 Supreme Court 697 set forth the following test regarding contract impairment caused by state law.

"Under contract clause, threshold inquiry is whether state law has, in fact, operated as substantial impairment of contractual relationship; severity of impairment is said to increase level of scrutiny to

116

which legislation will be subjected." U.S.C.A. Const. Art. 1, S 10, ch. 1.

This court would ask, what is the impairment complained of by the affected defendants?

It would appear that their lease agreement to conduct public bingo games for stated charitable purpose has been impaired to the extent that they are required to obtain 50l(c) Federal Exemption to assure their claimed identity—namely that of being a charitable organization before continuing under their lease agreement under which they had been operating.

In the case of *Carroll v. State*, supra, the Supreme Court stated on page 146:

The Constitution of Florida is a limitation of power, and while the legislature cannot legalize any gambling device that would in effect amount to a lottery, it has inherent power to regulate or to prohibit any and all other forms of gambling. *Lee v. City of Miami*, 121 Fla. 93, 163 So. 486, 490 (1935). In exercising this power to regulate, the legislature, in its wisdom, has seen fit to permit bingo as a form of recreation, and at the same time, has allowed worthy organizations to receive the benefits.

In the case of *Division of Pari-Mutuel Wagering, Department of Business Regulation v. Florida Horse Council, Inc.*, 464 So. 2d 128 (Fla. 1985) the court held on page 130:

"Authorized gambling is a matter over which the state may exercise its police power in a more arbitrary manner because of the noxious qualities of the enterprise as distinguished from those enterprises not affected with the public interest and those enterprises over which the exercise of the police power is not so essential for the public welfare.

The court would thus find that the requirement that an organization which claims to be engaged in charitable purpose which has entered into a commercial lease for the purpose of raising funds from the public by operating a regulated lottery entirely for charitable purpose and recreation cannot complain the 50l(c) Internal Revenue exemption requirement is an unreasonable impairment of contract.

Counsel for the state properly contended that "the test of unconstitutional impairment of contract requires the court to balance the nature and extent of impairment with the importance of county and state's objective." *Yellow Cab v. Dade County*, supra.

IV. Sections 21-131 through 21-139 of the Metropolitan Dade County Code are referred to as the Bingo Ordinances. Counsel

for the defendants challenges the provisions of 21-135 of these ordinances which require, among other things, that the operator of the bingo games shall post the total gross receipts collected per each bingo game and which such receipts shall be posted after each game is completed.

He argues that his client sells packets of bingo cards covering 10 separate games and that a patron might purchase a second packet while he was playing the third game, for example, on a card resulting from his first ten packet purchase.

How then, he argues, can the total gross receipts collected per each bingo game be determined? Of course it is mathematically reasonable to divide the proceeds collected for ten games and credit such amount for each game; or, to indicate the total gross receipts collected per each game as set forth in the ordinance which would include the receipt of monies for each ten packet purchase at the time of the game that the ten packet of cards were sold.

During his testimony, Mr. Finklestein candidly acknowledged that he failed to post any reports of gross receipts collected per each bingo game during any of the 120 games played per session on a seven day a week basis.

Section 21-135 of the Metropolitan Dade County Code sets forth as follows:

Sec. 21-135. *Information relative to each game to be posted.*

During the course of any and all bingo games, the operator shall post in a conspicuous place, in letters and numbers no smaller than three (3) inches in height, the following information:

(a) Names of all persons operating and/or assisting in the operation of the bingo game, together with the name of the charity with which they are associated;

(b) *The total gross receipt collected per each bingo game;*

(c) The total value of all prizes, whether in money or merchandise to be awarded per each bingo game;

(d) The net receipts collected but not awarded as prizes.

*The information in subsections (b), (c) and (d) shall be posted after each game is completed and indicate separate entries for each game. All such figures shall remain posted until the last bingo game is played for that day.* Operators of bingo games on premises owned by a charity or leased from a charity as defined in section 21-131(c), which owns said premises shall be exempt from the provisions of

118

subsections (b), (c) and (d) of this section but must make such information available to any player within forty-eight hours upon demand. (Ord. No. 75-50, S 5, 7-2-75) (Emphasis supplied)

The court has previously noted that there is no constitutional right to conduct a gambling business and that bingo is a form of lottery. In fact bingo law 849.093 falls within the statute which prohibits the conducting of a lottery for money or anything of value as set forth in Florida Statute 849.09. The conducting of bingo games is permitted to be conducted only by qualified charitable organization, and subject to specific rules set forth by the state and county.

The right of Metropolitan Dade County to regulate bingo was addressed by the Appellate Court in the case of *Jordan Chapel Freewill Baptist Church v. Dade County* (Fla. 3rd DCA 1976).

The Court noted on page 668 of this decision:

"The court finds that the purpose of the Bingo Ordinance is to protect legitimate, charitable organizations from profit seekers who are or may be reaping the benefits from supposedly charitable bingo operations. The testimony taken by the Dade County Commission clearly documents the purpose of the ordinance and the Court finds that there exists a rational relationship between the purpose of the ordinance and public health, safety, welfare and morals."

This Court would find that the bingo ordinance requiring posting of receipts, as noted, is a proper and reasonable exercise of the police power and is capable of reasonable compliance as written.

Mr. Finklestein testified that 120 games were played within a 14 hour period; and that he worked with five volunteers, some of whom helped conduct bingo games as members of more than one charitable organization which conducted bingo games at the Sky Lake premises.

He indicated that his method of sale of a packet of bingo cards covering 10 bingo games, made the posting requirement unwieldy, if not impossible to perform.

The court finds that bingo reporting ordinance, as drawn, is reasonable and subject to reasonable compliance by the bingo game operators. The court has noted that Mr. Finklestein was not required by law to conduct 120 bingo games at the rate of nearly one game every five minutes over an approximate 14 hour period on a seven day per week basis.

It would appear to the Court that Mr. Finklestein's testimony may have been less than entirely forthcoming in respect to certain matters

**119**

presumably within his scope of knowledge as manager of the Sky Lake Bingo Club.

When first asked by the prosecutor on cross examination whether he received remuneration for his duties, (the Bingo Statute specifically provides that a person involved in the conduct of a bingo game shall not be compensated in way for operation of said games) he replied that he was compensated only when bingo game equipment broke down and he was required to repair such item of equipment.

When asked by the court if he was paid on the basis of individual repair jobs as suggested by his answer to the prosecutor, he replied that bingo equipment often breaks down and he spends certain hours four afternoons a week repairing such breakdowns.

He thereupon stated that he was paid $200.00 per week for such repair services. He further testified, in this regard, that he spent an additional 44 hours per week on the Sky Lake Mall Bingo premises on an unpaid basis acting in the capacity of a volunteer. The court has previously noted that in spite of his position as Sky Lake Mall Bingo Manager he had difficulty in remembering, but later could only estimate, gross daily profits realized from the bingo operations. He was unable to remember the bingo hall rental payments but stated that they were of record.

He could not account for specific expenses incurred by the afore-noted bingo operation to account for the difference between his estimated $360,000.00 annual bingo gross profit and the relatively miserly annual amount obtained by the sponsoring charities of $18,000 on a total daily basis of $50.00 per day.

His testimony, however limited, was less than reassuring to the Court and provided a rare glimpse into the murk and machinations employed under color of compliance with charitable bingo fund raising laws.

The Court has not overlooked the fact that bingo brings pleasure to large numbers and that testimony indicated that there were 180 church and school bingo games and 150 bingo games conducted in condominiums in this community.

The county bingo ordinance makes certain exceptions regarding regulation for such operators of bingo games *on premises owned* by a charity in operation for three years or more and engaged in charitable, civic, community, benevolent, religious or scholastic and or similar work.

On the other hand Detective Jennings stated that there were 12

120

Shopping Center "commercial entities" which operated bingo games in the Dade County such as the Sky Lake Mall operation. Such bingo operations were frequented primarily by the general public and ostensibly conducted to raise money for the sponsoring charity.

When one considers that according to testimony five volunteers worked as many as 14 hours each while engaged in the conduct of bingo games for the total daily return of $50.00 to the sponsoring charity, it becomes evident that the return to the charity for efforts of such volunteers amounted to less than $1.00 per hour. The gain realized by the sponsoring charity, when considered on the basis of the volunteers' hourly expenditure of time and effort, is paltry indeed.

The small financial return to the charity, when considered in the light of hours and effort expended by volunteers in the conducting of such large numbers of bingo games, suggests that the sponsoring charitable organization might well consider the sale of Girl Scout cookies as a more wholesome and profitable alternative.

The Court, having heard testimony of witnesses for both parties and argument of counsel, accordingly finds that Florida Statute 849.093 and Metropolitan Dade County Code Ordinances 21-131 thru 21-139 relating to the conduct of bingo games constitute a necessary and proper exercise of the police power and set forth clear and reasonable standards of regulation and performance.

The court finds that both the aforenoted Florida Statute and County Ordinances noted are constitutional.

Defendants' Motions to Dismiss are accordingly denied.