ON MOTION FOR REHEARING
MAKAR, J.
Gadsden County, where the pari-mutuel facilities of Gretna Racing, LLC., are located, held a countywide non-binding vote in January 2012, the result of which showed that the sentiments of a majority of its electorate favor slot machines at those facilities. Based upon that vote, Gretna Racing now seeks a license for slot machines. Via local referenda authorized by a 2004 state constitutional amendment, however, slot machines were approved and are currently permitted in only two Florida counties: Miami-Dade and Broward. Art. X, § 23, Fla. Const. The question in this statutory interpretation case is whether the Legislature intended to allow expansion of slot machines via local referendum into all other Florida counties in like manner through a 2009 enactment. See Ch. 2009-170, Laws of Florida, § 19 (amending section 551.102(4), Fla. Stat.). Because the Gadsden County vote was not an authorized “referendum,” amounting to only a non-binding vote of the electorate, it has no binding legal effect. Moreover, nothing in the language, structure, or history of slot machine legislation, including section 551.102(4), Florida Statutes, provides authorization for the holding of slot machine referenda in counties other than Miami-Dade and Broward counties. The administrative order denying issuance of a slot *17 machine license to Gretna Racing is upheld.[1]
I.
A. The 1885 Constitution
Florida has no history or tradition of allowing slot machines within its borders. To the contrary, other than a very brief period in the State’s history — a depression era lacuna from about 1935 to 1937 when the state legislature and the state supreme court were briefly in synch over their legality in highly limited circumstances — slot machines have been prohibited as unlawful lotteries from statehood until the recent passage of'a constitutional amendment in 2004 authorizing referenda in Miami-Dade and Broward Counties to permit their usage (more on that later).
The 1885 Constitution prohibited lotteries. Art. Ill, § 23 (1885) (“Lotteries are hereby prohibited in this State.”). As mechanical slot machines developed shortly before the turn of the century, they were generally considered within this prohibition. Because the 1885 Constitution did not define the scope of what constituted a lottery, the Legislature liad a degree gf flexibility in determining its definitional parameters, which it exercised by enacting the State’s first slot machine statute in 1935, allowing for their use. , By doing so, the Florida Supreme Court was put in the position of deciding whether slot machines were impermissible under the state constitution’s anti-lottery provision, resulting in a judicial decision that altered the three-part lottery test that had prevailed since shortly after the 1885' Constitution was enacted (a lottery = prize + chance + consideration). In an adroit ruling, the supreme court added a fourth part to the test — widespread operation — which allowed the úse of slot machines unless they became too prevalent. That decision, Lee v. City of Miami, 121 Fla. 93, 163 So. 486 (1935), upheld the facial validity of a statute allowing the use of specified slot machine-like devices, but held that their widespread use might amount to an impermissible lottery under the constitutional prohibition. Id, at 490 (“It may be that some of [the coin-operating vending machines], or possibly all of them in their operation, will become [illegal lotteries]; but we leave that question to be determined when a specific case arises.”); see also Hardison v. Coleman, 121 Fla. 892, 164 So. 520, 524 (1935) (lotteries include “such gambling devices or methods which because of their wide or extensive operation a whole community or country comes within its contaminating influence”). Thus, as of 1935, a limited class of slot machines were deemed permissible, and were authorized by legislative act,' so long as their use was not widespread or extensive across a community. Slot machines, like the proverbial camel’s nose under the tent, rapidly proliferated but soon fell in disfavor due to their widespread use and deleterious effects,[2] As one commentator has noted:
*18 When the Florida Supreme Court decided Lee and Hardison in 1935, it must have viewed slot machines as novelties and standalone devices, like Mr. Hardi-' son’s slot machine, as opposed to paper lottery tickets, which could be sold and distributed all over a community. Things did not unfold in the next two years in the way the Florida Supreme Court apparently expected in 1935. In 1937, the Florida comptroller, the same J.M. Lee who had prevailed in Lee, prepared a document for Florida Governor Fred Cone estimating there to be 10,000 slot machines with total yearly play of $52 million in Florida. Even children were allowed to, gamble on these, machines. Slot machines in their,actual operation had collectively turned out to be widespread and lotteries under Lee’s criteria, but the Florida Supreme Court did not have a case to revisit the issue directly. Instead, the legislature and Governor Cone took matters into their own hands by repealing the, 1935 slot machine statute in 1937. The vote for repeal in the legislature was overwhelming. This repeal statute, which also banned slot machines, was authored and vigorously championed by a young representative and future Florida governor named LeRoy Collins, who called the two-year experience with slot machines “a dose of moral poison.”
David G. Shields, Slot Machines in Florida? Wait A Minute, Fla. B J., Sept./Oct, 2013, at 12 (footnotes omitted). In two years, a complete turn of the wheel had occurred; slot machines were prohibited once again. By 1939, the three-part test was back in force; the “widespread operation” part that the court temporarily relied upon to legitimize slot machines was now absent. See Little River Theatre Corp. v. State ex rel. Hodge, 185 Fla. 854, 185 So. 855, 861 (1939). (“The authorities are in accord that a lottery has three elements; first, a prize; second, an award by chance; and, third, a consideration.”). And slot machines were again relegated to nothing more than a societal menace. Pasternack v. Bennett, 138 Fla. 663, 190 So. 56, 57 (1939) (“[I]t is definitely settled in this jurisdiction that those devices commonly known as slot machines are gambling devices; that the use and operation of them has a baneful influence on the persons who indulge in playing them and that they constitute such a menace to public welfare and public morals as to be subject to the police power of the State to regulate, control, prohibit or destroy them.”).
B. The 1968 Constitution
Over three decades passed before the issue of lotteries arose again. In adopting a new state constitution, the people of the State of Florida included an anti-lottery provision that drew upon the 1.885 Consti-. tution’s ban of all lotteries with the limitation that certain existing types of parimutuel pools would be allowed to continue. The new anti-lottery provision stated: “Lotteries, other than the types of parimutuel pools authorized by law as of the effective date of this constitution, are hereby prohibited in this state.” Art. X, § 7, Fla. Const. (1968). In essence, the 1968 constitutional revision cemented in place the statewide ban on all types of lotteries (which would include slot machines used on a widespread basis), allowing only the limited types of .gaming that then existed by law. r.
This point was made in'a' case .out of Jacksonville, Florida, in which the legality of bingo was questioned under the newconstitution. By close vote, the Florida *19 Supreme Court held that because bingo was legislatively authorized at the time of article X, section 7’s enactment, it was grandfathered in as a permissible lottery.
Obviously, the makers of our 1968 Constitution recognized horse racing as a type of lottery and a ‘pari-mutuel pool’ but also intended to include in its sanction those other lotteries then legally functioning; namely, dog racing, jai alai and bingo. All other lotteries including bolito, mba, slot machines, etc., were prohibited.
Greater Loretta Imp. Ass’n v. State ex rel. Boone, 284 So.2d 665, 671-72 (Fla.1970) (emphasis added). As the highlighted language makes evident, the supreme court-consistent with article X, section 7’s clear language — drew a bright line: existing “lotteries” such as pari-mutuél pools for dog racing, jai alai and bingo survived;' all other “lotteries” including “slot machines” were impermissible. Whatever authority the Legislature may have previously had to allow these types of gaming was’ gone. A broad definition of lottery now prevailed, one that included slot machines, but which excluded gaming then-sanctioned by legislation. A new era was ushered in, one in which a constitutional amendment was necessary to allow any type of activity broadly understood as a lottery under article X, section 7 other than those grandfathered in. This understanding of the constitutional language, as interpreted in Greater Loretta was put' into doubt in 2004, as the next section explains.
C. The 2004 Slots Amendment and Chapter 551
After the decision .in Greater Loretta, interest in expanding gaming in Florida via constitutional amendment increased. Various failed proposals were attempted.[3] In the 1986 general election, however, the state constitution was amended to authorize a state-run lottery whose net proceeds would be put in a state education trust fund. Art. X, § 15(a), Fla. Const. (“Lotteries may be operated by the state.”).
Starting in 2002, an effort was made to amend the constitution to allow slot machines in all counties by local referenda. Proposed section 19(a) of the amendment stated:
(a) Slot machines are hereby permitted in those counties where the electorate has authorized slot machines pursuant to referendum, and then only within licensed pari-mutuel facilities (ie., thoroughbred horse racing tracks, harness racing tracks, jai-alai taontons, and greyhound dog racing.tracks) authorized by law as of the effective date of this section, which facilities have conducted live pari-mutuel wagering events in each of the two immediately' preceding twelve month periods.
Advisory Op. to the Att’y. Gen. re Authorization for Cnty. Voters to Approve or Disapprove Slot Machines Within Existing Pari-Mutuel Facilities, 818 So.2d 98, 99 (Fla.2QQ2). .The proposal was held to violate the single subject requirement and was thereby removed from the ballot.'
In 2004, a , more limited constitutional amendment was proposed “that would permit two Florida counties to hold refer-enda on whether to permit slot machines in certain parimutuel facilities.” Advisory Op. to the Att’y. Gen. re Authorizes Miami-Dade & Broward Cnty. Voters To Approve Slot Machines In Parimutuel Facilities,, 880 So.2d.522 (Fla.2004) (“Ad *20 visory Op. re: Slot Machines ”).[4] Those opposing the so-called Slots' Amendment argued in their briefs that the amendment, -if passed, would allow a form of lottery and thereby amend the anti-lottery provision of the constitution without .saying so -in the ballot summary. No party cited Greater Loretta, nor did the Florida Supreme Court in its advisory opinion, which said — contrary to both Greater Loretta’s statement that slot machines are an impermissible type of lottery under the 1968 constitution, and the holdings in Lee and Hardison that slot machines would be impermissible lotteries if in widespread use — that slot machines are not a form of lottery. Id. at 525. In doing so, the supreme court relied only on its 1930s decisions in Lee and Hardi-son, citing them for the proposition that the court had “long since settled the question of whether slot machines constitute lotteries.” Id. at 525. On its face, the supreme court’s advisory opinion overlooked its precedent in Greater Loretta and misapprehended the limited scope of Lee and Hardison, which during their fleeting shelf lives in the 1930s never authorized slot machines on a widespread basis.
To effectuate the Slots Amendment, the Legislature in 2005 enacted Chapter . 551, Florida Statutes, entitled “Slot Machines”, which laid out the authority for slot machines in Miami-Dade and Broward Counties and the manner in which they would be regulated. As to authority, the statute in section 551.101, entitled “Slot machine gaming authorized,” stated — and still states today — as follows:
Any licensed pari-mutuel facility located in Miami-Dade County, or Broward County existing at the time of adoption of s. 23, Art. X of the State Constitution that has conducted live racing or games during calendar years 2002 and 2003 may possess slot machines and conduct slot machine gaming at the location where the pari-mutuel permitholder is authorized .to. conduct pari-mutuel wagering activities pursuant to such per-mitholder’s valid . pari-mutuel permit *21 provided that a majority of voters in a countywide referendum have approved slot machines at such facility in- the respective county. Notwithstanding any other provision of law, it is not a crime for a person to. participate in slot machine gaming at a pari-mutuel facility licensed to possess [slot machines] and conduct slot machine gaming or to participate in slot machine gaming described in this chapter.
§ 551.101, Fla. Stat; Ch. 2005-362, § 1, Laws of Fla. The bracketed phrase was added in'2007. Ch. 2007-5, § 129, Laws óf Fla. No other change has been made to this section, which specifies the breadth of the counties -for whom authorization is explicitly authorized: Miami-Dade and Bro-ward only.
This point was emphasized in an inter-branch dispute over the State’s gaming compact with the Seminole Tribe. See Fla. House of Reps. v. Crist, 999 So.2d 601, 614 (Fla.2008) (“The’ state’s constitution authorizes the state lottery, which offers various Class III games, and now permits slot machines in Miami — Dade and Bro-ward Counties.”) (emphasis added). Indeed, in holding that Governor Crist exceeded his authority in signing a compact with the Seminole Trib§ that allowed for gaming that was illegal under Florida law, the Florida Supreme Court said “[i]t is .., undisputed ... that the State prohibits all other types of Class III gaming, including lotteries not sponsored by the State and slot machines outside Miami — Dade and Broward Counties.” Id. (emphasis added). In other words, as of 2008, the supreme court recognized that slot machines continued to- be illegal other than in Miami-Dade and Broward Counties, seemingly in conflict with the supreme court’s 2004 statement in Advisory Opinion re: Slot Machines.
D. The 2009 Amendments to Chapter 551
Because the gaming compact with the Seminole Tribe had just been deemed illegal, during its next general session in 2009 the Florida' Legislature was consumed with enacting legislation to ensure a legal compact was achieved, which resulted in last minute legislative ping-pong between the Senate and House to finalize what ultimately was chapter 2009-170, Laws of Florida. What began and progressed through the session as a bill devoted entirely to the Seminole Tribe gaming compact issue, Senate Bill 788 ultimately morphed into a final bill that also included the amendment to section 551.102(4) at issue here.
During the conference committee process, the following amendment to section 551.102 was added and approved:
551.102. Definitions.
As used in this chapter, the term:
(4) “Eligible facility” means any licensed pari-mutuel facility located in Miami-Dade County or Broward County existing at the time of adoption of s. 23, Art. X of the State Constitution that has conducted live racing or games during calendar years 2002 and 2003 and has .been approved by a-majority of voters in a countywide referendum- to have slot machines at such facility in the respective county; any licensed pari-mutuel facility located uñthin a county as defined in s. 125.011, provided such facility has conducted live racing for 2 consecutive calendar years immediately preceding its application for a slot machine license, pays the required license fee, and meets the other requirements of this cha/pter; or any licensed pari-mu-tuel facility in any other county in which a majority of voters have approved slot machines at such facilities *22 in a cou/ntywide referendum held pursuant to a statutory or constitutional authorization after the effective date of this section in the respective county,provide ed such facility has conducted a full schedule of live racing for 2 consecutive calendar years immediately preceding its application for a slot machine license, pays the required licensed fee, and meets the other requirements of this chapter.
Ch. 2009-170, §• 19, Laws of Fla. Sections 4 through 25 of the act would not take effect by their enactment; instead, they would only take effect if specified events in the process of establishing the Seminole Gaming Compact were achieved.[5] -These conditions precedent were removed during th,e next legislative session. Ch. 2010-29, § 4, Laws of Fla,
The 2009 amendment’to “eligible" facilities” has two clauses, referred to as the “second clause” and.“third clause.” The former, which was designed to expand the number of facilities in Miami-Dade County beyond those existing at the time, was uphold in Florida Gaming Centers, Inc. v. Florida Department of Business & Professional-Regulation, 71 So.3d 226 (Fla. 1st DGA 2011) (statute allowing holders of pari-mutuel wagering permits in Miami-Dade County to obtain approval for slot machines in that county did not violate constitutional provision authorizing slot machine gaming in Miami-Dade County; Legislature may expand slot machine gaming beyond the existing facilities provided they meet the specified criteria). . The third clause, the one at issue in this litigation, is claimed by Gretna Racing to be the Legislature’s expression of authority to allow slot machine referenda in any of the other,sixty-five Counties where pari-mutuel facilities are currently located;[6] the Department reads its differently, siding with the hearing officer and the Attorney General, who read it to say that the- authonzation for slot machine referenda does not exist other than in Miami-Dade and Bro-ward Counties.
*23 A.
This case has been presented as a statutory interpretation ease, but, as an initial matter,, it is not at all dear that the Legislature has the constitutional authority to expand the use of slot machines outside of the geographic areas of Broward and Miami-Dade Counties as permitted by article X, section 23. The Florida Supreme Court’s decision in Greater Loretta, which has not been overturned, explicitly held that article X, section 7, of the 1968 Con-, stitution, prohibited- — as a form of lottery — the use of slot machines anywhere in the State. It is worth repeating: “All other lotteries including bolito, cuba, slot machines, etc., were prohibited,” 234 So.2d at 672 (emphasis added). Yet the supreme court in Ad/uisory Opinion re: Slot Machines in 2004 statéd its belief that its 1930s decisions involving slot machines had settled the question of whether slot machines are lotteries, but it did so without so much as mentioning its directly contrary decision in Greater Loretta; the supreme court is not in the habit of silently overruling its precedents. Puryear v. State, 810 So.2d 901, 906-06 (Fla.2002) (“We take this opportunity to expressly state that this Court does not intentionally overrule itself sub silentio.”). So which is. it? Are slot machines a form of lottery that only the people may approve via constitutional amendment? Or are slot machines not prohibited as lotteries under article X, section 7, which may be legislatively authorized statewide without constitutional authority?
Despite the uncertainty that exists, counsel for Gretna Racing and the Department at oral argument disagreed with the notion that any constitutional limitation exists on the Legislature’s authority to expand slot machines statewide; they disagreed only on whether the statute at issue was intended to do so without additional statutory or constitutional authority. Similarly, some argue that this Court has already implicitly held in Florida,Gaming Centers that the Legislature is not limited by the anti-lottery provision in article X, section 7, and may expand, slot machines statewide if it chose to do so. That case, of course, did not make such a holding, didn’t even mention Greater Loretta, and was limited to only whether a facility in Miami-Dade County could be legislatively included as an eligible facility for slot machines in that already-approved jurisdiction. 71 So.3d at 227-29. That the Legislature allowed additional facilities in a county already authorized by article X, section 23, to have slot machines is a far different question than whether the Legislature may allow expansion into any other counties that have not been given constitutional authority to hold slot machine refer-enda. As such, it appears that a serious unresolved question exists, one upon which this Court need not pass to resolve the specific dispute this case, but one for which a clear resolution is needed. See generally Shields, supra (discussing the need to address the conflict between Greater Loretta and Advisory Opinion re: Slot Machines).
B.
Bearing in mind the history of the illegality of slot machines in Florida, and keeping the Florida Supreme Court’s uncertain jurisprudence about slot machines as lotteries as- a backdrop, we turn to the statutory interpretation question at issue: Did the Legislature intend its 2009 amendment to the definition of “eligible facility” in section 561.102(4) to authorize the counties other than Miami-Dade and Broward to hold slot machine referenda in their jurisdictions without the passage of additional authority for such'referenda?
*24 The' key portion to be interpreted is whether “a majority of voters have approved slot machines at such facilities in a countywide referendum held pursuant to a statutory or constitutional authorization after the effective date of this section 'in the respective county.” § 551.102(4), Fla. Stat. (emphasis added). The question is which of two differing interpretations of the italicized phrase should prevail.
Gretna Racing operates a pari-mutuel facility in Gadsden County, which held a “voter’s sentiments” election on January 31, 2012, on the topic pursuant to section 125.01(l)(y), Florida Statutes. Gretna Racing reads this phrase as two separate and independent provisions: “held [1] pursuant to a statutory or constitutional authorization [2] after the effective date of this section.” It reads the latter portion— [2]—to mean that a county is authorized to hold a local vote on slot machine' approval “after the effective date” of the statute. Rather than modifying the immediately adjacent word “authorization,” it views [2] as modifying the word “held” only, which appears eight words earlier. It reads the former portion—[1]—as meaning that slot machine approval need only be “pursuant to a statutory or constitutional authorization” on the books at the time of the vote. It rejects reading [1] and [2] together as requiring specific or additional statutory or constitutional authorization for county re-ferenda to approve slot machines, such as the authorization given to Miami-Dade and Broward under article X, section 23; instead, a county may hold a slot machine vote under whatever existing general authority - it. has to submit a votes to the public.
The Department offers a different view, one that is consistent with a plain reading of the statute, the rules of statutory construction, and the history of slot machine legislation- in Florida. The Department views the phrase “pursuant to a statutory or constitutional authorization after the effective date of this section” as one continuous, connected union of words that collectively state the authority to which a slot machine referendum must be held. The phrase, in total, directly follows and modifies the words “referendum held” to explain that the “statutory or constitutional authorization” for a referendum on slot machines must be “after the effective date of this section.” In other words, the legal “authorization” for such a vote is not already on the books; the authorization must be “after” the section’s effective date.
This reading is superior to that posited by Gretna Racing in many ways. First, under a plain reading approach the language at issue is' essentially one long adjective modifying “referendum,” explaining what authorization is necessary for future county referenda on slot machines. It does not require that the two components of the phrase, [Ij and [2], be separated and moved about like refrigerator magnets to restructure and thereby change the meaning of the statute. Under Gretna Racing’s reading, the statute would read: “referendum held [2] after the effective date of this section and [1] pursuant to an existing general statutory or constitutional authorization of referenda after-the-effective-date of-tUs-sect-ion.” Separating and re-positioning the phrase “after the effective date of this section” to an earlier point changes the statute markedly; detaching the two neighboring words “authorization after” from one another removes the direct temporal connection between them. Read as written by the Legislature, the “statutory or constitutional authorization” for the re-ferenda must have arisen “after the effective date of this section.” Moreover, the phrase “referendum ‘ held pursuant to a statutory or constitutional authorization after the effective date of this section” envisions a separate and distinct new basis of *25 authority; if existing referenda powers were enough, the statute need only say “held pursuant to statutory or constitutional authorization,” making the “a” redundant. It is plain that this statute alone does not provide the authorization for statewide slot machine referenda.
This perspective is consistent with the Attorney General’s view of the third clause, upon which the hearing officer heavily relied:
Applying standard rules of statutory and ' grammatical construction, it is clear that the phrase “after the effective date of this section” modifies the words immediately preceding it, ie., “a statutory or constitutional authorization.” Specifically, under the last antecedent doctrine of statutory interpretation, qualifying words, phrases, and clauses are to be applied to the words or phrase immediately preceding, and are not to be construed as extending to others more remote, unless a contrary intention - appears. Here, all pertinent considerations confirm that the Legislature intended that any statutory or constitutional authorization for a slots-approving referendum must occur after July 1, 2010, the effective date of the relevant portion of section 551.102(4), Florida Statutes.
Op. Att’y Gen. 12-01 (2012) (internal citations and footnotes omitted); see also. State v. Fam. Bank of Hallandale, 623 So.2d 474, 478 (Fla.1993) (“Although an opinion of the Attorney General is not binding on a court, it is entitled to careful consideration and generally should be regarded as highly persuasive.”); Beverly v. Div. of Beverage of Dep’t of Bus. Reg., 282 So.2d 657, 660 (Fla. 1st DCA 1973) (official opinions of the Attorney General, -though not binding, are “entitled to great weight in construing the law of this State.”)-. The Attorney General continued, saying:
Similarly, if a county’s existing powers were sufficient to; authorize a slots-approving referendum, there would be no need to include the phrase “pursuant to a statutory or constitutional authorization.” Had the Legislature simply been referring to- a county’s existing statutory or constitutional authority, the following stricken language could have been omitted without causing any change in the meaning of the statute:
“any licensed pari-mutuel facility in ' any other county in which a majority of voters have approved slot machines at such facilities in a countywide referendum held after the effective date of this section in the respective, county, provided such facility has conducted a full schedule of live racing for 2 consecutive calendar years, immediately preceding its application for a slot machine license, pays the required licensed fee, and meets the other requirements of this chapter.”
Instead, the Legislature chose to .mandate that the referendum be held “pursuant to a statutory or constitutional .authorization” — an explicit qualifier, that appears to be unique in the Florida Statutes. Indeed, no other referendum provision in the Florida Statutes employs similar language. Thus, I cannot conclude that the language “statutory or constitutional authorization” merely recognizes a county’s authority in existence as of fhe effective date of .the. act. Rather, the Legislatures chosen language requires the adoption of a statute or constitutional amendment specifically authorizing a referendum to approve slot machines.
Op. Att’y Gen. Fla. 12-01 (2012) (footnotes omitted). Her opinion, .though not binding, and merely persuasive, is spot on.
The statute meed not be rewritten to achieve the Department’s view by insert *26 ing the word “enacted” between “authorization” and “alter” (i.e., “pursuant to statutory or constitutional authorization enacted after the effective date of this section.”). While insertion of the word “enacted” may provide a degree of clarity, it is unnecessary. And from a grammatical viewpoint, the statute would.need to say “pursuant to a statute statutory or constitutional amendment authorization enacted after the effective date of this section”. to be intelligible. Statutes and constitutions can be “enacted”; saying an “authorization” was “enacted” is exceptionally awkward.
Second, the Department’s reading is more faithful to the statute’s structure and answers the question of what legal authorization is necessary for local" slot referenda. Keep in mind that no statutes exist that provide authorization for slot machine approval via county referenda other than those passed to effectuate referenda in Miami-Dade and Broward as constitutionally authorized, see, e.g., §§ 551.101 (slot machines in Miami-Dade and Broward au-. thorized “provided that a majority of voters in a countywide referendum have approved slot 'machines at such facility in the respective county.”) and .104(2) (“An application may be' approved by the division only after' the voters of the county where the applicant’s facility is located have authorized by referendum' slot' machines within pari-mutuel facilities in that county as specified in s. 23, Art. X of the State Constitution.”). Gretna Racing cannot point to any such authorization; all it relies upon is á generalized “voter sentiment” statute (discussed later) that provides no authorization for approval of any substantive matter of county concern. § 125.01(y), Fla. Stat. Gretna Racing’s reading of section 551.102(4) would transform an exceedingly limited authority for county straw polls into a broad authority to expand slot machines statewide, which cannot possibly be what the Legislature intended.
Third, if the Legislature truly intended to immediately expand the authority of counties to hold referenda on slot machines, without future “statutory or constitutional authorization” for such referenda, it assuredly would have amended a critical portion of the slot machine statute, which is .the authorization section, entitled “Slot machine gaming authorized.” .§ 551.101, Fla. Stat. That statute, which. limits authorized slot machine gaming to , Miami-Dade and Broward Counties, .was not amended to include any other possibilities.
Fourth, it takes little imagination to envision, particularly in the heat of an internal debate over legislation about the Seminole Tribe gaming compact, that the potential proliferation of slot machines statewide in competition with the Tribe’s gaming operations would merit some legislative statement about how local expansion : beyond Miami-Dade and Broward might occur. On this point, the Attorney General, recognizing the context in which section 551.102(4) was amended, said:
[T]he conclusion that additional legislative authorization is required for a slots-approving referendum gives due recognition to the context in which the Legislature adopted the relevant portion of section 551.102(4), Florida Statutes. The language in question took effect as part of legislation ratifying a gaming compact between the State and the Seminole Tribe of Florida, which contained provisions mandating a reduction or loss of revenue to the State in response to an expansion .of slot machine gambling beyond that which existed at the time of the compact’s adoption. To read the pertinent language in section 551.102(4) as allowing counties other than Miami-Dade and Broward by referendum to authorize slot machines, absent specific *27 legislative or constitutional authority, would be at odds with the' legislation as a whole. Specifically, that interpretation of the statute would eliminate the State’s control over its continued entitlement to a substantial amount of revenue from the Seminole Tribe. In light of the intense consideration and debate , that went into the Legislature’s approval of the Seminole compact, it is virtually unthinkable that the Legislature would have intended ,to both undermine and ratify the compact in the same , enactment. The basic canons of statutory interpretation require me to reject a reading of section 551.102(4) that would lead to such an absurd result.[7]
Op. Att'y Gen. Fla. 12-01 (2012). In this context, the third clause is easily seen as a statement that set. the parameters for possible future expansion via county referendum, which would require “statutory or constitutional authorization after the effective date of this section.” This view of the statute does not render it meaningless or inconsequential. It reflects that the authority to expand slot machines beyond Miami-Dade; County must be pursuant to a statutory or constitutional authorization that currently does not exist, which makes sense given the first clause’s limitation to Miami-Dade County -as well as the doubt that surrounds whether the Legislature has authority .to expand slot machines into counties other than Miami-Dade and Bro-ward without a constitutional amendment like article X, section 28. Nothing prohibits legislation that has a contingency that makes a statute effective only upon some triggering event (such as possible future authorization of slot machines oh a local basis via referendum). And nothing prohibits the Legislature ft'om-enacting a statute that operates as a restraint on society with a stated understanding about how that restraint might be .eliminated in the future. Not all statutes are blossoms; some are only seeds. One need look no further than our state constitution, which has a provision allowing for the legislature to pass a special law without notice to an affected community that “is conditioned to become effective only upon approval by vote of the electors of the area affected.” Art. III, § 10, Fla. Const, (emphasis added). By analogy, the enactment of the third clause in 551.102 was the legislature acting in anticipation of a contingency..
Fifth, to the extent , one sees an ambiguity in the statute, the legislative history, exceptionally limited as it is (nothing written, only comments by legislators during a floor debate), is helpful. The . Attorney General’s opinion js again persuasive on this point: • -
Legislative intent, the cornerstone of all statutory interpretation,, may be illuminated by the comments of the sponsor, or proponents of a bill or amendment. The Senate bill sponsor, Senator Dennis Jones, gave the following-explanation on second reading of the 2010 legislation in response to a question about the local referendum process for a county that wants to add slot machine gaming and how that process would work:
“Should we want to expand in . the future,.a Legislature would come back *28 and.. let’s just say we wanted to go to Class III'slots, we could not do that as a local bill but we could come up here and file it as a general bill and should that bill pass to allow [a county] to have a referendum of the people and then the people- vote on it, if it was passed, we could get Class III slots but it [would] also break the compact with the Indians.”
In further clarification, Senator Jones stated:
“If they have a referendum in a county outside of Miami-Dade and Bro-ward for the purpose of Class III gaming and the Legislature passes the legislation to allow that county to have the referendum, the county has the referendum and that referendum passes, then that would effectively break the payments of the compact.” (e.s.) ■’
The above explanation by a sponsor of the legislation clearly indicates that, under the pertinent language in section 551.102(4), Florida Statutes, a county referendum to approve slots must be specifically' authorized by a statute or constitutional amendment enacted after July 1, 2010. ' Such an explanation is contrary to any assertion that the Legislature intended the provisions of section 551.102(4), in conjunction with a county’s already-existing' powers, to constitute authority for a county to hold a referendum on slot machine gaming. '
Op. Att’y Gen. Fla. 12-01 (2012) (footnotes omitted). What’s more, Gretna Racing seeks an exception to the long-standing prohibition against slot machines, the possession and use of which are criminal acts absent clear authorization, • which is why the statute at issue is strictly construed as opposed to expansively interpreted. PPI, Inc. v. Dep’t of Bus. & Prof'l Reg., Div. of Pari-Mutuel Wagering, 698 So.2d 306, 308 (Fla. 3d DCA 1997) (“The penny-ante statute is an exception to long-standing Florida law that prohibits all such forms of gambling; as such, it is to be strictly construed.”); State v. Nourse, 340 So.2d 966, 969 (Fla. 3d DCA 1976) (“Being an exception to a general prohibition, any such statutory provision is normally construed strictly against the one who attempts to take advantage of the exception.”).
In sum, little commends the reading that Gretna Racing places on section 551.104(2), and essentially every meaningful means of statutory interpretation favor the Department’s view, which is itself accorded great weight. Orange Park Kennel Club, Inc. v. State, Dep’t of Bus. & Prof'l Reg., 644 So.2d 574, 576 (Fla. 1st DCA 1994) (“An agency’s construction of a statute which it administers is entitled to great weight and will not be overturned unless the agency’s interpretation is clearly erroneous; the agency's interpretation need not be the sole possible interpretation or even the most desirable one; it need only be within the range of possible interpretations.”). For these reasons, the denial of Gretna Racing’s request for a slot machine license was proper.
C.
Finally, even if the statute could be read as Gretna Racing suggests, the Gadsden County vote was neither a “referendum” nor did it provide voter approval as section 551.104(2) requires, which states that a “majority of voters have approved slot machines at such facilities in a countywide referendum ” to be eligible. (Emphasis added). The state constitution provides that “Special elections and referenda shall be held as provided by law.” Art. VI, § 5, Fla. Const. The phrase “as provided by law” means an act passed by the Legislature. Holzendorf v. Bell, 606 So.2d 645, 648 (Fla. 1st DCA 1992).
*29 ■ The sole statutory authorization the County relied upon for holding a “referen-da” on slot machines, section 125.01 (l)(y), Florida Statutes, neither provides for a “referendum” nor does it permit voter approval of any substantive matters. It states in relevant part:
(1) The legislative and governing body of a county shall have the power to carry on.county government. T.o the extent not inconsistent with general or special law, this power includes, but is not restricted to; the power to:
(y) Place questions or propositions on the ballot at any primary election, general election, or otherwise called special election, when agreed to by a majority vote of the total membership of the legislative and governing body, so as to obtain an expression of elector sentiment with respect to matters of substantial concern within the county. No special election may be called for the purpose of conducting a straw ballot.
§ 125.01(1)'(y), Fla.‘ Stat; (emphasis added). Rather than allowing for voter approval bn a substantive matter, which is the essence of a referendum, see 5 McQuillin Mun. Corp. § 16:51 (3d ed.) (“Referendum is the right of people to have an act’passed by the legislative body submitted for their approval or rejection”) (footnote omitted), section 125.01(1)(y) merely allows for voters to express their sentiments on a matter. Voter sentiment falls short of voter approval; sentiment is mere opinion akin to a straw vote that is non-binding; approval is authorization, .which, is "binding. City of Miami v. Stoats, 919 So.2d 485, 487 (Fla. 3d DCA 2005) (non-binding straw ballot defective because “it fails to adequately inform the voting public that their response has no official effect, i.e., that the ballot question is simply a. nonbinding opinion poll.”); 5 McQuillin Mun. Corp. § 16:51, (3d ed.) (“Ordinarily, ‘referendum’ does not include nonbinding public questions.”) (footnote omitted). At most, the County could only have put to the voters the non-binding question of whether they are supportive of slot machines in the Gretna Racing facility. City of Hialeah v. Delgado, 963 So.2d 754, 757 (Fla. 3d DCA 2007). And to the extent the County’s vote under section 125.01(1)(y) is portrayed as a binding “referendum,” it was not; it could not have been absent statutory or constitutional authorization giving the County referendum powers. As we said in Holzendorf, “Since the constitution expressly provides that the power of referendum can be granted only by the legislature, it is beyond the power of the electorate to say what shall or shall not be done by referendum.” Id. The administrative order, even if incorrect in its construction of section 551.102(4) is nevertheless legally correct. Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So.2d 638, 645 (Fla. 1999) (appellate court not limited to “reasons given by the trial court but rather must affirm the judgment if it is legally correct regardless of those reasons”).
III.
The Department’s interpretation of the third clause in section 551.102(4) is an entirely reasonable one. The alternative view, which would restructure the statute and change its meaning to allow slot machines to be deployed on a statewide basis without any clear authority to do so, is inconsistent with principles of statutory and constitutional construction, legislative intent, and the history of laws prohibiting slot machines in the State of Florida. Because the issue presented is one of great public importance statewide, the following certified question is appropriate:
Whether the Legislature intended that the third clause of section 551.102(4), Florida Statutes, enacted in 2009, au *30 thorize expansion of slot machines beyond Miami-Dade and Broward Counties via local referendum in all other eligible Florida counties without, additional statutory or constitutional authorization after the effective date of the act?
Should our supreme court choose to review this question, consideration should also be given to resolution of the Legislature’s authority under the 1968 Constitution to authorize slot machines at pari-mutuel facilities in counties other than Miami-Dade or Broward, whose authority arises from article X, section 23. Puryear v. State, 810 So.2d 901, 906-06 (FIa.2002) (“Where this Court’s decision's create this type of disharmony within the case law, the district courts may utilize their authority to certify a question of great public importance to grant this Court jurisdiction to settle the law.”); Leisure Resorts, Inc. v. Frank J. Rooney, Inc., 664 So.2d 911, 912 (Fla.1995) (“Having accepted jurisdiction, we may review the district court’s decision for any error”).
AFFIRMED.
BILBREY, J., Concurring in part and in Result With Opinion.
BENTON, J., Dissenting with Opinion.

. Due to the retirement of a panel member soon after the issuance of our original opinions, three things happened. First, a motion for rehearing and rehearing en banc was filed upon which the Court’s members began voting as to the latter. Second, via random assignment, a replacement for the retired panel member was done administratively. Third, in light of the reconstitution of the panel, the en banc Court all but unanimously voted to abate its vote on the pending motion for en banc review to' allow the panel to consider the case anew, which we have done, granting the motion for rehearing and substituting this opinion.

. See generally Stephen C. Bousquet, The Gangster in Our Midst: Al Capone in South Florida 1930-1947, 76 Fla, Hist. Q. 297, 307 (1998) (history of gangster Al Capone in Miami) noting that "wide-open gambling rackets in South Florida stretched from Coral Gables *18 north to Fort Lauderdale” and that the "legalization of racetrack betting in 1931, .and of slot machines four years later, made South Florida a mecca for gamblers,”)..

. See, e.g., Floridians Against Casino Takeover v. Let's Help Florida, 363 So.2d 337 (Fla. 1978) (proposed amendment to authorize state-regulated, privately operated casino gambling in Dade and Broward Counties with tax revenues to be used for education and local law enforcement purposes) (allowed on ballot, but failed).

. . The proposal was as follows:
Article X, Florida Constitution, is hereby amended to add the following as section 19: SECTION 19. SLOT MACHINES—
(a)After voter approval of this constitutional amendment, the governing bodies of Miami-Dade and Broward Counties each may hold a county-wide referendum in their respective counties on whether to authorize slot machines within existing, licensed pari■mutuel facilities (thoroughbred and harness racing, greyhound racing, and jai-alai) that have conducted live racing or games in that county during each of the last two calendar years before the effective date of 'this amendment. If the voters of. such county approve the referendum question by majority vote, slot machines shall be authorized in such parimutuel facilities. If the voters of such county by majority vote disapprove the referendum question, slot machines shall not be so authorized, and the question shall not be presented in another referendum in that county for at least two years.
(b) In the next regular Legislative session occurring after voter approval of this constitutional amendment,1 the Legislature shall adopt legislation implementing- this section and having an effective date no later than July 1 of the year following voter approval of this amendment. Such legislation shall authorize agency rules for implementation, and may. include provisions for the licen-sure and regulation of slot machines. The Legislature may tax slot machine revenues, and any such taxes must supplement public education funding statewide.
(c) If any part of this section is held invalid for any reason, the remaining portion or portions shall be severed from the invalid portion and given the fullest possible force and effect.
(d) This amendment shall become effective when approved by vote of the electors of the state.
Advisory Op. re: Slot Machines, 880 So.2d at 522-23. After passage, it was placed in section 23 of article X rather than section 19.

. - The contingencies were met “if the'Governor and an authorized representative of the Seminole Tribe .of Florida execute an Indian Gaming Compact pursuant to the Indian Gaming Regulatory Act of 1988 and requirements of ‘this act, only if the compact is ratified by the Legislature, and only if tire compact is approved .or deemed approved, and not voided pursuant to the terms of this act, by the Department of the Interior, and such sections take effect on the daté that the approved compact is published in the Federal Register.” Ch.. 2009-170, § 26, Laws of Fla.

. Gretna Racing correctly notes that other than Miami-Dade and Broward Counties, seventeen other counties currently have parimutuel facilities thereby making them the only ones eligible for slot machines because statutory locational restrictions prevent new facilities absent legislative action. § 550.054(2), Fla. Stat. (2015). Even so, this potenfiál geographic expansion of slot machines is eyebrow-raising. Using population data (which does not account for tourists), Miami-Dade and Broward currently have •about 4,532,109 residents (about 22.8% of the State's overall population). ,If slot machines were permitted in facilities in these seventeen additional counties, whose populations total 8,590,612 (or about 43.2% of the State's overall population), a tripling of direct access to slot machines (66.0%) would occur; if indirect access is taken into account, by including adjacent counties, the percentage jumps to 96.6%, leaving only ten counties (all rural, totaling only about' 3.4% of the State's population) that neither have, nor have a neighboring county whh, a pari-mutuel facility. See U.S. Census Bureau, State & County QuickFacts, quickfacts.cen-sus.gov/qfd/states/12000.html (last visited July ■2, 2015); Pari-Mutual Permitholders with 2014-2015 Operating Licenses (Nov. 24, 2014), http://www.myfioridalicense.com/dbpr/ pmw/documents/MAP-Permitholders— WITH — 2014-2015-OperatingLicenses— 2014-ll-24.pdf.

. Nine thousand, six hundred voters (33.5% of the 28,684 then-registered in Gadsden County), weighed in on the question, 6,042 favorably. That the sentiments of these 6,042 voters in one of Florida's smaller counties, representing just 0.085% of registered voters statewide at the time, could unilaterally jeopardize the State’s receipt annually of hundreds of millions of revenues under the Seminole Tribe' compact punctuates how unfathomable such a result would be. See Fla. Dep't, of State, Div. of Elections, Voter Registration Year to Date Report; January 2012, available at http://dos.myflorida.com/ elections/data-statisties/voter-registration statistics/votor-registratlon-monthly-reports/.